## LONGSHORE PRINTING COMPANY *v.* HOWELL.
[S. C. 38 Pac. 547.; — L. R. A. ——.]

26   527
45   330

1. PLEADING — DEMURRER.— The general rule that on the hearing of a demurrer all the allegations of the pleading demurred to must be taken as true is limited to allegations of fact, and does not apply to statements of conclusions or of law.   The probative facts alone are admitted.

2. CONSPIRACY — TRADES UNIONS — PUBLIC POLICY.— At one time it was held by the courts that combinations of workmen to effect a desired end were illegal and indictable, but the later authorities, both English and American, agree that trades unions, in the ordinary acceptation of that term, are not unlawful combinations, so long as they do not resort to acts of violence, or endeavor to accomplish some end that is contrary to public policy.   It is then not illegal, *per se,* for a union to adopt and endeavor to maintain a scale of wages, or to endeavor to limit and regulate the employment of apprentices.

3. CONSPIRACY — LABOR ORGANIZATIONS.— Trades unions and labor organizations generally, like all voluntary associations, must depend for their membership upon the willing consent of each member, and they may not resort to violence, threats, intimidation, or other compulsory means to enforce obedience to their rules and regulations.

4. STRIKES — TRADES UNIONS.— A "strike" among workmen is not *per se* illegal or criminal, though it may become both by the means employed to enforce its objects.   Workmen may quit the service of an employer, either singly or in a body, as they may see fit, and they may not be either enjoined or prosecuted for so doing, unless the end to be attained or the means used to attain it be unlawful.

5. TRADES UNIONS — UNLAWFUL CONSPIRACY — CODE, § 1893.— The action of the executive committee of a labor union in going to an establishment and

directing the members of the union at work there to cease their work, under penalty of being dealt with according to the rules of the union, is **not**, in the absence of intimidation or violence, unlawful under section 1893 of Hill's Code, making it a misdemeanor for any one by force, threats, or intimidation to prevent, or attempt to prevent, any employe from continuing his work.

6. CIVIL LIABILITY OF TRADES UNIONS — STRIKES — INJUNCTION.—Although it is not a crime under the statutes of Oregon for several persons to combine or conspire to do some injury to the public or to some individual, such conduct is *per se* wrongful, and the persons guilty thereof may still subject themselves to civil liabilities. Thus, if several persons conspire and combine to injure or destroy another's business, and it appears that the injury is imminent and will be irreparable to the suitor, the conspirators will be restrained by injunction, though their acts may not violate any statute.

7. INJUNCTION AGAINST BOYCOTT.—Allegations by plaintiff that the members of a certain trades union conspired to compel him to submit to the union's dictation upon pain of being boycotted in business; that the union's executive committee entered his premises without license, and ordered his employes to strike, and that subsequently the union ordered another strike, both which orders were obeyed; that defendant induced the city council, with threats of boycott at the polls, to reject plaintiff's bid for the city printing, although the bid was the lowest made; that defendant threatened to boycott plaintiff's customers if they patronized him, on account of which he lost one customer, and will lose another; and that defendant circulated the fact of such strikes by posting notices thereof in numerous places, all committed within a period of ten months, to the past injury and future danger of plaintiff's business, do not show such a wicked and persistent persecution of plaintiff or its business as to justify an injunction, for it does not seem that under all the circumstances the injury will be irreparable.

8. PLEADING FACTS.— A complaint should always state the facts which plaintiff thinks justify the relief asked, and not the pleader's conclusions, so that the court may determine whether the relief asked is appropriate to the existing conditions.

9. INJUNCTION AGAINST CONSPIRACY*—BOYCOTT.—A court of equity will not hesitate to issue an injunction for the protection of property rights against

*A series of five cases presenting various phases of the general subject of conspiracies by workmen, boycotts and strikes, as modified by the writ of injunction, is published in 19 L. R. A. pp. 382–412. In *Cœur d'Alene Mining Company* v. *Miners' Union*, 19 L. R. A. 382, 51 Fed. 260, the court sustained an injunction restraining intimidating words and acts by an association of workmen which tended to hinder other employés from working for certain employers, and thereby prevent these employers from carrying on their business; and before that courts had enjoined the publication of post ers, notices, circulars, etc., issued in pursuance of a boycott declared by a labor union

irreparable damage by wrongdoers, yet it is always a delicate step to take, and the court ought to be fully satisfied that some right is about to be destroyed or irreparably and lastingly injured, and that the danger is pressing and imminent.

APPEAL from Multnomah: LOYAL B. STEARNS, Judge.

The plaintiff was incorporated on March twenty-first, eighteen hundred and ninety-one, and is engaged in the business of lithographing, engraving, printing, and publishing journals, newspapers, etc. The Multnomah Typographical Union is an unincorporated voluntary association, of which the defendant George Howell is president. The defendants J. M. Maxwell, John Rhodes, Nat L. Cassady, J. C. Gallagher, M. Goughler, L. B. Johnson, and Hugh Glen are members of the present executive committee, of which Maxwell is chairman, and E. De Yarmand, L. Statham, J. Jordan, John Filbin, Geo. F. Halsey, and M. A. Lundwall are ex-members of the same committee. The object of the association, as declared by the preamble to its constitution, is in part to establish and maintain an equitable scale of wages, and to protect its members from sudden or unreasonable fluctuations in the rate of compensation for their labor, and to protect just and honorable employers from the unfair competition of unscrupulous and unreliable rivals, to defend their rights and advance their interests as workmen, to create an authority whose seal shall constitute a certificate of character, intelligence, and skill, to foster fellowship and brotherhood, to aid the destitute and unfortunate, and

against the complainant. See *Casey* v. *Cincinnati Typographical Union*, 45 Fed. 135, 12 L. R. A. 193, where there is an extensive note discussing boycotts, conspiracies, intimidation of employés, and the rights of workmen in choosing employment. The cases of *Arthur* v. *Oakes*, 25 L. R. A. 414, 63 Fed. 327; *State* v. *Glidden*, 3 Am. St. Rep. 23, 55 Conn. 46; and *Sherry* v. *Perkins*, 9 Am. St. Rep. 689, 147 Mass. 212, are interesting in this connection. In the last named case an injunction was issued restraining defendants from gathering in crowds about plaintiff's place of business, and interfering with his workmen, either at the shop or on their way to and from work. *Murdock* v. *Walker*, 34

to encourage the principle and practice of conciliation and arbitration in the settlement of differences between labor and capital. The membership, consisting of about two hundred, is confined to printers, and includes only persons directly employed in printing books, newspapers, etc., such as compositors, proof-readers, foremen, pressmen, and stereotypers, Section 1, article XV of the constitution, provides that when a vote is taken in the union on ordering a strike, on a reduction of a scale, alteration of a scale, or any dispute as to the construction of a scale, * * * it must be by ballot, etc.; and section 2 provides that no person shall be allowed to vote for or against a strike unless he shall have been a member in good standing for six months prior to the ballot. A scale of wages has been adopted, and made a part of the constitution. The bylaws, among other things, provide as follows:—

"Section 1, article VI. Each newspaper office employing less than twenty-five men in its composing room shall be entitled to one apprentice. Where twenty-five or more are employed, two apprentices shall be allowed. Each job office shall be entitled to one apprentice. In offices employing five journeymen on an average, two apprentices may be employed.

"Section 1, article VIII. Any member failing to comply with the constitution, bylaws and other established regulations of this union, or guilty of the wilful violation of any boycott adopted by the union, the International Typographical Union, or any trades or labor unions represented by the delegates in a trades assembly in which this

Am. St. Rep. 678, 152 Pa. St. 595, is a similar case. The latest adjudications on the subject are *Barr* v. *Essex Trades' Council* (N. J.), 30 Atl. 881, where an association of labor unions was enjoined from continuing a boycott against the Newark Times, after a particularly full and careful discussion of the limits within which a boycott may safely be carried on; and *Continental Insurance Company* v. *Board of Underwriters*, 67 Fed. 310, where the court refused to enjoin a combination of fire insurance agents to regulate rates so long as threats and intimidation were not used against plaintiff.

The Supreme Court of the United States has recently decided that 'the federal

union is represented   *   *   *   shall be punished by fine, reprimand, suspension, or expulsion.

"Section 2.   Any member accepting work in any office where the hands have struck on any question involving the regulations of this union, the union having ordered such strike, and who shall refuse to cease work when ordered by the president or executive committee, shall be suspended or expelled, as may be determined by two thirds of the members voting."

These facts appear from the complaint, in which the following grounds for relief are also in substance alleged: That plaintiff has an expensive plant, and has acquired a lucrative and remunerative business; that about sixteen months after plaintiff had established itself in business it ascertained that its employés were being interviewed by the defendants and their associates, and that its business was being injuriously interferred with by them; that the plaintiff and its officers have heretofore refused to submit to all the laws, rules, and regulations of the union, or to permit the union to dictate the mode and manner in which it shall conduct its business; and that for this reason the executive committee and the officers and members of the union combined and conspired to compel a compliance with such rules and regulations, and a submission to the dictates of the union in that respect, upon pain of being boycotted in its business.   The plaintiff had in its employ a number of the members of the union and other persons, among whom was a messenger boy, engaged in putting in order the odds and ends of the office, whose

courts have power to issue injunctions to prevent interference with the transmission of the mails and with interstate commerce, ( *In re Debs,* 15 Sup. Ct. 900,) the court placing its decision on the broad ground that the government of the United States is supreme within its territory, and in the exercise of those powers granted to it by the constitution may appeal to the civil courts for an inquiry and determination as to whether the transmission of interstate commerce and the mails have been obstructed, and if such is the case, or seems imminent, to invoke the power of its courts by injunction to prevent or remove the obstruction, and that the jurisdiction of equity in such

time was not fully occupied, which boy the executive committee demanded should be dismissed from service, and, upon being refused, without license or any lawful business, entered the premises of plaintiff, and ordered all the members of the union then and there to cease working for plaintiff, under penalty of being dealt with in accordance with the rules and regulations of the union; that the workmen were intimidated and influenced thereby, and at once obeyed the order, and without notice to plaintiff ceased work, and left its premises, leaving its contracts with patrons unfinished, many of which were important and emergent; that the said committee and members of the union circulated the fact that the employés of the plaintiff had been called off, and its office left without hands, and on the twenty-seventh and twenty-eighth days of August, eighteen hundred and ninety-two, published the following advertisement in the local news columns of the Oregonian: "To Our Friends.—Persons intending having job printing done will bear in mind that the Longshore establishment, on Front, between Alder and Washington Streets, is a nonunion office. Executive Committee Multnomah Typographical Union, No. 58"; that at the same time the members of said executive committee, in their official as well as personal capacity, visited numerous patrons of the plaintiff, and informed them that plaintiff was under the ban of the union's displeasure, and held out the threat and intimated to said patrons that if they continued to patronize plaintiff the members of the union and such others as they could influence would withdraw their

a case is well established and of undoubted authority. Other courts have exercised such jurisdiction under the terms of the interstate commerce acts: *Toledo and Ann Arbor Railroad Company* v. *Pennsylvania Company*, 19 L. R. A. 387, 395, 54 Fed. 730, 746; *United States* v. *Workingmen's Amalgamated Council*, 26 L. R. A. 158, 24 Fed. 994: *Thomas* v. *Cincinnati, etc., Railroad Company*, 62 Fed. 803; *United States* v. *Elliott*, 62 Fed. 801; *id.* 64 Fed. 27. See also the proceedings in the various federal courts during the noted American Railway Union strike in eighteen hundred and ninety-four, as shown in the following cases: *United States* v. *Debs*, (GROSSCUP, D. J.,) 63 Fed. 436; *id.* (WOODS, C. J.), 64

business from them; that subsequently thereto the plaintiff put in a bid to the common council of the City of Portland for doing the city printing for the year eighteen hundred and ninety-three, which was the lowest bid made for said work, and that said executive committee and members of the union, for the purpose of. preventing the acceptance of said bid, threatened said council and the members thereof with their displeasure, and with boycott at the polls should they seek reëlection, and with injury to their private business interests, if they disregarded their demands, and that said council for that reason alone rejected plaintiff's bid; that the defendants maliciously, unlawfully, and persistently pursued this course for about eight months, when they ceased their attacks for a short time only; that on the twelfth day of March, eighteen hundred and ninety-three, plaintiff had in its employ two apprentices, but that it also had in its employ on an average five journeymen; that the defendants demanded that it discharge one of said apprentices, and, upon being refused, the union passed a resolution ordering all men working for plaintiff to quit, and they, being intimidated thereby, obeyed the order, leaving plaintiff without necessary assistance to carry on its business; and that the executive committee, with malicious intent, conspiring and contriving to injure and destroy the business of plaintiff, posted the following notice in numerous places, viz.: "Owing to the Longshore Printing Company breaking the rules of the Multnomah Typographical Union, all members of the union were withdrawn March sixteenth,

Fed. 724; *United States* v. *Alger*, (BAKER, D. J.,) 62 Fed. 824; *In re Charge to Grand Jury*, (GROSSCUP, D. J.,) 62 Fed. 828; *In re Grand Jury*, (ROSS, D. J.,) 62 Fed. 834; *id.* (MORROW, D. J.), 62 Fed. 840; *Southern California Railway Company* v. *Rutherford*, (ROSS, D. J.,) 62 Fed. 796; *Thomas* v. *Cincinnati, etc., Railroad Company*, (TAFT, C. J.,) 62 Fed. 803. The only case opposing the views expressed in these decisions is *United States* v. *Patterson*, (PUTNAM, C. J.,) 55 Fed. 605, which is distinctly disapproved of in *Thomas* v. *Cincinnati, etc., Railroad Company*, 62 Fed. 821. The details of the unparalled railroad conspiracy of eighteen hundred and ninety-four, are quite fully set forth in *United States* v. *Debs*,

eighteen hundred and ninety-three,"—and also notified plaintiff that they now intended to fight it to the death; that ever since that time the defendants and other members of the union have persistently visited and harassed the patrons of plaintiff with demands that they cease to give their work to it upon penalty of incurring the ill will and displeasure of not only this but all labor unions; that the apprehension of loss of trade and the business of the members of said union and other labor unions, and the continual harassing and vexatious visits and interviews to which they have been subjected have induced a large number of plaintiff's best patrons to withdraw their patronage from it, among others the Meier & Frank Company whose printing work is valuable; and that Mason, Ehrman & Company, whose business is also valuable, have notified plaintiff of its intention to so withdraw their patronage.

And the plaintiff further alleges, in substance, that the whole scope, object, and intent of said typographical union is to create a monopoly of labor in the printing business, and that its said interference with plaintiff is an infringement upon private right and against public policy; that said union arrogates to itself the right to dictate to employers as to whom and what persons they shall employ, and, if compliance with its dictates is withheld, then the right to force obedience through the instrumentality of the boycott; that the defendants and all the members of the union have unlawfully, maliciously, and deliberately conspired to destroy the business of plaintiff, and render its plant and property valueless, or, as an alternative, to drive plaintiff, against its will, into a submission to the laws, rules, and regulations of the union; and that all the

64 Fed. 725, in the Thomas case, 62 Fed. 821, and in *United States* v. *Cassidy*, 67 Fed. 698.

It has been suggested that the writ of mandamus may be made good use of in the settlement of labor disputes and strikes, (see an article by Stephen B. Stanton in 34 American Law Register and Review, 102,) but no attempt of that kind has yet been reported from the appellate courts.— REPORTER.

aforesaid acts of defendants and other members of the union have been committed in pursuance of such conspiracy and combination; that in furtherance of said common purpose, defendants and their associates have warned, threatened, and intimidated, and still continue to warn, threaten, and intimidate, printers and others, for the purpose of deterring and preventing them from entering the employ of plaintiff, and that they have heretofore and do now continue persistently and maliciously to visit a great many of the patrons of plaintiff, and to threaten them with a withdrawal of business, for the purpose of deterring them from giving work and employment to plaintiff, with the ultimate object of reducing its profits and income, and so to cripple and injure it in its business as to force it into a submission to the unlawful demands of the union; that the long continued and constantly recurring acts of defendants and threats to continue said trespasses constitute a nuisance, and that by reason thereof plaintiff has lost heavily, and, if continued, the injury to its business will become irreparable, to prevent which an injunction is asked. A demurrer was interposed to the complaint, which was sustained, and this order is assigned here as error.                                            AFFIRMED.

For appellant there was a brief and oral argument by *Mr. John H. Handy.*

For respondent there was a brief by *Messrs. McGinn, Sears & Simon,* and an oral argument by *Mr. Alfred F. Sears, Jr.*

Opinion by MR. JUSTICE WOLVERTON.

1.   The questions presented for our consideration arise upon demurrer to the complaint, and hence all the allegations contained therein must be taken as true.  This rule

must be understood, however, to include only such allegations as contain statements of facts as distinguished from statements of conclusions of fact or of law. It is a well settled rule of pleading that bare allegations of conclusions cannot avail the pleader, especially where a demurrer is interposed, without a statement of the probative facts upon which said conclusions are based. Even then the conclusions may often be stricken out upon motion as irrelevant and redundant matter. A brief summary of the definite, tangible facts which appear upon the face of the complaint, and which alone can form the basis of this suit, will aid us materially in arriving at a correct conclusion as to whether the plaintiff is entitled to relief in equity by the extraordinary remedy of injunction. The existence of the plaintiff as a corporation, and of the Multnomah Typographical Union, No. 58, as a voluntary unincorporated association, the objects of such association as shown by its constitution and bylaws, and the relations which defendants bear to such association, are all facts which are taken as granted. The overt acts charged upon which equity jurisdiction is invoked are about as follows: *First*, the executive committee of the Multnomah Typographical Union, No. 58, without leave or license, and without lawful business, entered the premises of plaintiff and ordered all union men employed therein to quit under penalty of being dealt with in accordance with the laws, rules, and regulations of the union, which order was obeyed by the men; *second*, the committee and members of the union circulated the fact that the employés of plaintiff had been called off; *third*, the committee published the following advertisement in the local news columns of the Oregonian: "To Our Friends.—Persons intending having job printing done will bear in mind that the Longshore establishment on Front, between Alder and Washington Streets, is a nonunion office. Executive Committee Mult-

nomah Typographical Union, No. 58"; *fourth,* the committee and members of the union induced the common council of the City of Portland to reject plaintiff's bid for the city printing for the year eighteen hundred and ninety-three by threatening said council with their displeasure and boycott at the polls; *fifth,* on the twelfth day of March, eighteen hundred and ninety-three, the union passed a resolution ordering all union men working for plaintiff to quit, and that the men being intimidated thereby observed the order; *sixth,* the committee caused the following notice to be posted in numerous places, viz.: "Owing to the Longshore Printing Company breaking the rules of the Multnomah Typographical Union all members of the union were withdrawn March sixteenth, eighteen hundred and ninety-three"; *seventh,* the committee notified plaintiff that they now intended to fight it to the death; *eighth,* the Meier & Frank Company, whose business was valuable to plaintiff, withdrew their patronage, and Mason, Ehrman & Company, whose business is also valuable, notified plaintiff of their intention to withdraw.

All these acts are alleged to have been committed in pursuance of a conspiracy entered into by and between the executive committee and the members of Multnomah Typographical Union, No. 58, for the purpose of injuring and destroying plaintiff's business, or compelling it to submit to the rules and regulations of the association. When divested of all surplusage, the complaint simply shows that defendants have been guilty of one act of trespass, that of entering plaintiff's premises unbidden; some acts by reason of which plaintiff was deprived of certain business, that of the city printing for the year eighteen hundred and ninety-three; and of some acts on account of which one customer, the Meier & Frank Company, has withdrawn its employment of plaintiff, and another

26 OR.—68.

gave notice of an intention to do likewise. These constitute all the specific injuries which plaintiff has sustained at the hands of the defendants. To prevent further threatened injuries of the same nature, and the damage to plaintiff's business from becoming irreparable, an injunction is sought. The publication in the Oregonian, the posting of said notices, the circulation of the fact that the union employés of plaintiff had been called off, and the threat made directly to the plaintiff by the executive committee that they "now intend to fight it to the death," can hardly be termed such acts of malicious, unwarranted aggression as must of themselves be regarded as actionable *per se*, but of this we will have more to say hereafter.

2. It is apparent that one purpose of this suit is to prevent strikes by the union employés of the plaintiff, or, to put it more directly, to prevent the union from calling off or interfering with such of said employés as the association is able to control through its organization. At one time, in England, it was maintained by some judges that trades unions were illegal combinations, and indictable at common law. In *Rex* v. *Mawbey*, 6 Term R. 636, Grose, J., by way of illustration, makes use of the following language: "As in the case of journeymen conspiring to raise their wages, each may insist on raising his wages, if he can; but if several meet for the same purpose, it is illegal, and the parties may be indicted for a conspiracy." From a review of this case it is apparent that this language was not necessary to a decision of the points made. In *Hilton* v. *Eckersly*, 6 El. & B. 52, Crompton, J., in referring to *Rex* v. *Mawbey*, says that Grose, J., "assumed the illegality of such combinations as well known law," and further remarked that "combinations of this nature, whether on the part of the workmen to increase, or of the masters to lower, wages, were equally illegal." But Lord Campbell, C. J., in a concurring opinion with Crompton, J.,

seriously doubted whether such was the law, and after citing *Rex* v. *Mawbey*, said: "I.cannot bring myself to believe, without authority much more cogent, that if two workmen, who sincerely believe their wages to be inadequate, should meet and agree that they would not work unless their wages were raised, without designing or contemplating violence or any illegal means for gaining their object, they would be guilty of a misdemeanor, or liable to be punished by fine and imprisonment. The object is not illegal, and therefore, if no illegal means are to be used, there is no indictable conspiracy. Wages may be unreasonably low or unreasonably high: and I cannot understand why in the one case workmen can be considered as guilty of a crime in trying by lawful means to raise them, or masters in the other can be considered guilty of a crime in trying by lawful means to lower them." And later English authorities concede that members of trades unions binding themselves not to work except under certain conditions, and to support one another in the event of being thrown out of employment in carrying out the views of the majority, do not bring themselves within the criminal law: *Hornby* v. *Close*, L. R. 2 Q. B. 151; *Farrer* v. *Close*, L. R. 4 Q. B. 602. Since the enactment of statutes 6 Geo. IV, C. 129, as modified by 22 Vict. C. 34, and 34 and 35 Vict. C. 31, and similar statutes, trades unions are recognized as legal associations, with objects which they may endeavor to secure by pecuniary and other means of supporting strikes and the like, so long as they do not resort to secret or other violence, or to threats, intimidation, or any acts of like character, which will tend to destroy freedom of action. Early American cases are in consonance with the earlier English adjudications, but later authorities concur in the more reasonable and enlightened view that trades unions, in the ordinary acceptation of the term, are not within and of themselves unlawful combina-

tions. "It is no crime for any number of persons, without an unlawful object in view, to associate themselves together, and agree that they will not work for or deal with certain men or classes of men, or work under a certain price, or without certain conditions"*: *Carew* v. *Rutherford,* 106 Mass. 14; *Snow* v. *Wheeler,* 113 Mass. 186; *Commonwealth* v. *Hunt,* 4 Met. (Mass.), 134; *Rogers* v. *Evarts,* 17 N. Y. Sup, 268. It was therefore not unlawful for Multnomah Typographical Union, No. 58, to adopt a scale of wages. Neither was it unlawful for the union to make provisions in its bylaws limiting the number of apprentices to one for each newspaper office employing less than twenty-five men, and two when employing twenty-five or more, and one to each job office, and two when employing five journeymen on an average. No member of this association can now be charged with criminal conspiracy as under the common law, simply because of the fact that he with others have combined for the purpose of maintaining wages or limiting the number of apprentices, as contrary to public policy.

3. It must be understood, however, that these associations, like other voluntary societies, must depend for their membership upon the free and untrammeled choice of each individual member. No resort can be had to compulsory methods of any kind either to increase, keep up, or retain such membership. Nor is it permissible for associations of this kind to enforce the observance of their laws, rules, and regulations through violence, threats, or intimidation, or to employ any methods that would induce intimidation

---

*The case of *Cate* v. *Murphy,* 39 Am. St. Rep. 686, presents an interesting example of a lawful combination among employers, assisted by certain classes of dealers, to keep down wages. *Continental Insurance Company* v. *Board of Underwriters,* 67 Fed. 310, and *Bohn Manufacturing Company* v. *Hollis,* 21 L. R. A. 337, 40 Am. St. Rep. 323; *Queen Insurance Company* v. *State* (Tex.), 22 L. R. A. 484; *State* v. *Phipps,* 18 L. R. A. 657, are additional cases involving the same principle. The Bohn case is criticised, and said to be a bad precedent, by the supreme court of Indiana in *Jackson* v. *Stanfield,* 36 N. E. 345. — REPORTER.

or deprive persons of perfect freedom of action. Such organizations may be preserved and their membership augmented by reasoning and fair arguments, and even by persuasion and entreaty, and an observance of their adopted constitutions and bylaws may be exacted through the same peaceful means, but beyond this it is not advisable from a legal standpoint to venture.* So much for the organization and its enforced coherence.

4. It has been said that there is no such thing as a legal or peaceful "strike." The term "strike" is differently defined by authors and judges. Webster defines it as "the act of quitting work; specifically, such an act by a body of workmen, done as a means of enforcing compliance with demands made on their employer." In 24 Am. and Eng. Ency. of Law, 123, it is defined as follows: "The term 'strike' is applied commonly to a combined effort on the part of a body of workmen employed by the same master to enforce a demand for higher wages, shorter hours, or some other concession, by stopping work in a body at a prearranged time, and refusing to resume work until the demanded concession shall have been granted," and again by ALLEN, J., in *Deleware, etc., Railroad Company* v. *Bowns,* 58 N. Y. 582: "A strike is a combination among laborers, those employed by others, to compel an increase of wages, a change in the hours of labor, some change in the mode and manner of conducting the business of the principal, or

*Mr. Justice BREWER, in the Debs case, — U. S. ——, uses the following luminous and expressive language to the same effect: " * * * but we may be permitted to add that *it is a lesson that cannot be learned too soon nor too thoroughly* that under this government of and by the people the means of redress of all wrongs is through the courts and at the ballot-box, and *that no wrong,* real or fancied, *carries with it legal warrant to invite as a means of redress the co-operation of a mob,* with its accompanying acts of violence." See also the cogent statements of Judge BAKER of Indiana in the case of *Lake Erie Railway Company* v. *Bailey,* 61 Fed. 494: "The court recognizes the right of any man or number of men to quit the service of their employers, and it recognizes the right of men to organize, if they deem it expedient, to better their condition. The court also recognizes the hardships in the life of the average working man, the scanty wages which they often receive, their long and arduous hours of service, frequently

to enforce some particular policy, in the character or number of the men employed, or the like." From these definitions it would seem that all strikes are not unlawful, and do not necessarily engender breaches of the peace. Sir James HANNEN, in his dissenting opinion in *Farrer* v. *Close*, L. R. 4 Q. B. 611, says: "I am of the opinion that strikes are not necessarily illegal. A strike is properly defined as 'a simultaneous cessation of work on the part of the workmen,' and its legality or illegality must depend on the means by which it is enforced, and on its objects. It may be criminal, as if it be part of a combination for the purpose of injuring or molesting either masters or men; or it may be simply illegal, as if it be the result of an agreement depriving those engaged in it of their liberty of action, similar to that by which the employers bound themselves in the case of *Hilton* v. *Eckersly*, 6 El. & B. 66; or it may be perfectly innocent, as if it be the result of the voluntary combination of the men for the purpose only of benefiting themselves by raising their wages, or for the purpose of compelling the fulfillment of an engagement entered into between employers and employed, or any other lawful purpose." Justice HARLAN, in the now celebrated case of *Arthur* v. *Oakes*, 63 Fed. 327, 25 L. R. A. 414, says: "We are not prepared, in the absence of evidence, to hold as a matter of law that a combination among employés having for its object their orderly with-

exposed to the rigors of an inclement season. * * * I confess I cannot look with any degree of tolerance on the false and dangerous teachings of those who actively, or by their silent acquiescence, are teaching labor organizations to think that because they are organized in associations they have the right to seize property, or by intimidation to prevent well disposed people from laboring. * * * I think that such organizations for lawful purposes are to be commended; but when they combine and confederate for the purpose of seizing other men's property, or when they undertake by force and intimidation to drive other men away from employment, and thus deny them the right of earning a livelihood, they commit a crime. There ought to be blazed on the mind of every man that belongs to a labor organization, as with a hot iron, so that he shall know and understand it, that, while it is lawful and commendable to organize for legitimate and peaceful purposes, it is criminal to organize for the invasion of the rights of others to enjoy life, liberty, and property."— REPORTER.

drawal in large numbers or in a body from the service of
their employers, on account simply of a reduction in their
wages, is not a 'strike' within the meaning of the word
as commonly used.   Such a withdrawal, although amount-
ing to a strike, is not, as we have already said, either
illegal or criminal." If one person can lawfully quit the
service of his employer because of the rate of wages paid
or the employment of objectionable persons, cannot sev-
eral or many persons, first agreeing among themselves to
the same purpose, likewise lawfully quit?

Conspiracy at common law was a combination between
two or more persons to do an unlawful thing, or to do a
lawful thing by unlawful means.   Where not under special
contract for a definite time, a simultaneous severance of
the relations between employer and employés at the in-
stance of the employés, and where there was no precon-
certed action of such employés, was never considered
unlawful.   Coming to the means employed, it is not un-
lawful for several or many employés to agree between
themselves to quit their employer.   As we have seen, at
one time it was held to be an unlawful conspiracy for la
borers to combine for the purpose of quitting simulta-
neously, with the ultimate purpose of raising their wages,
or inducing their employer to confine his employment to
certain kinds of labor, or the like; but this is not now the
law, the principle underlying it having long since been
discarded as inconsistent with liberty and the spirit of our
free institutions.   After workmen have thus combined, it
is still not unlawful for them, by the use of fair means,
to communicate the reasons for their design, and to signify
their intention of quitting to their employer: 24 Am. and
Eng. Ency. of Law, 123; *Bohn Manufacturing Company* v.
*Hollis*, 54 Minn. 233, 21 L. R. A. 337, 40 Am. St. Rep. 319;
55 N. W. 1119; *Walsby* v. *Anley*, 7 Jur. (N. S.), 466; *People* v.
*Kostka*, 4 N. Y. Crim. Rep. 434; *People* v. *Wilzig*, 4 N. Y. Crim.

Rep. 417; *Rogers* v. *Evarts*, 17 N. Y. Sup. 268.    Within these limits, a perfectly legitimate strike may be inaugurated and maintained, the object being to better the condition of workmen.    Such an object is not only legitimate and lawful, but is just and praiseworthy.    It was not wrongful, therefore, for the Multnomah Typographical Union to adopt a rule limiting the number of apprentices, and seek by fair means to enforce the observance thereof,* so that its purpose in that respect was lawful.    The claim that a monopoly is thus being promoted surely constitutes no grounds for equitable interference by injunction.    This whole controversy has arisen because of the existence of the rule referred to, and the efforts of the union to require its observance at the hands of the plaintiff.    When, however, unlawful means are used to uphold or maintain a strike, or if the purposes for which it is maintained are unlawful, then it follows as a matter of course that the strike is in itself unlawful.

5.    It is claimed in this case that the means employed by defendants were not permissible, and, being violative of the rights of plaintiff, it is entitled to an injunction to prohibit their continuance.    This brings us to the gist of the controversy.    The statute provides (Hill's Code, § 1893): "If any person shall, by force, threats, or intimidation, prevent, or endeavor to prevent, any person employed by another from continuing or performing his work, or from accepting any new work or employment; or if any person shall circulate any false written or printed matter, or be concerned in the circulation of any such matter, to induce others not to buy from or sell to or have dealings with any person, for the purpose or with the intent to prevent such person from employing any person, or to force or compel him to employ or discharge from his

*To the same effect generally see *Reynolds* v. *Everett* (N. Y.), 39 N. E. 72, decided the next day after this opinion was filed.— REPORTER.

employment any one, or to alter his mode of carrying on his business, or to limit or increase the number of his employés, or their rate of wages or time of service, such person shall be deemed guilty of a misdemeanor," etc.; and by section 1897 it is made a misdemeanor for any person to "wilfully and wrongfully commit any act which grossly injures the person or property of another, or which grossly disturbs the public peace, or health, or which openly outrages the public decency and is injurious to public morals." Section 1748 provides: "If any person, either verbally or by any written or printed communication, shall threaten any injury to the person or property of another * * * with intent thereby to extort any pecuniary advantage or property from such other, or with intent to compel such other to do any act against his will, such person upon conviction thereof shall be punished," etc. All these statutes are invoked in aid of plaintiff's contention. The first clause of section 1893 is directed against any person unlawfully preventing or endeavoring to prevent any person employed by another from continuing or performing his work. There are but two instances shown by the complaint in which the employés of plaintiff quit work. As to the first of these it is alleged: "That the said executive committee, combining and conspiring as aforesaid, for the purpose aforesaid, and professing to act by authority of the union, and in the capacity of the officers of the same, without lawful business, entered the premises of the plaintiff and ordered all members of the said union there and then at work under contract with the plaintiff to cease work further for it, under penalty of being dealt with according to the laws and regulations of said union. Said workingmen were intimidated and influenced thereby, and without delay immediately obeyed said unlawful and injurious order." And as to the second instance, the complaint

26 OR.— 69.

alleges: "That· on the twelfth day of March, eighteen hundred and ninety-three, the then president of said union, and its members and officers, by a resolution of said union passed on that day, maliciously and solely because plaintiff refused to submit to the said union, ordered all union men working for plaintiff to cease working for it, and the said workingmen, being intimidated by said order, did obey said order, and ceased to fulfill their contracts with plaintiff." In the one instance the men quit under an order from the executive committee, and the other in pursuance of a resolution of the union. No intimidation is specifically alleged or shown, unless it can be inferred that by a, refusal to quit the members of the union would subject themselves to the charge of insubordination to the order, and it does not appear that there was sufficient odium attached to this to put the members in fear, or that compliance with the order and resolution was induced thereby. The more reasonable presumption is that they quit because of the mutual understanding between the members to abide the action of the union and its executive committee. The latter clauses of section 1893 can have no application here, as it is not alleged or claimed that the notice published in the Oregonian and the one posted in numerous places were false.

6. The more serious phase of this case, and the one which demands special attention, is the alleged boycott of plaintiff in its business, inaugurated for the purpose of so handicapping it as to compel submission to the rules and regulations of the union. Every person has a right to require that he be protected in his property rights. "The labor and skill of the workman, or the professional man, be it of high or low degree, the plant of a manufacturer, the equipment of a farmer, the investments of commerce, are all in an equal sense property. If men by overt acts of violence destroy either they are guilty of crime": Ray

on Contractual Limitations, 409; *State* v. *Stewart*, 59 Vt. 273, 59 Am. Rep. 710. Sections 1897 and 1748 of the Code, seem especially designed to prevent and punish acts which are grossly injurious to person or property, and attempts to compel others to do any act against their will. It seems the principle that a combination or conspiracy of two or more persons to injure the rights of others is illegal, although nothing has been done in execution of that intent, has not been embodied in our statutes, but there is no good reason why civil liabilities may not ensue by reason of a conspiracy to commit that which is made unlawful by statute. "The general rule of the common law is that it is a criminal and indictable offense for two or more to confederate and combine together by concerted means to do that which is unlawful or criminal, to the injury of the public, or portions or classes of a community, or even to the right of an individual": *Commonwealth* v. *Hunt*, 4 Met. (Mass.), 121, 38 Am. Dec. 346. "Combinations against law or against individuals are always dangerous to the public peace and to public security": *State* v. *Burnham*, 15 N. H. 401. "An agreement to effect an injury or wrong to another by two or more persons is constituted an offense, because the wrong to be effected by a combination assumes a formidable character. When done by one alone it is but a civil injury, but it assumes a formidable or aggravated character when it is to be effected by the powers of the combination": *Reg* v. *Parnell*, 14 Coxe's Crim. Cases, 514. The entire current of authority for the last century or more is to the same effect. See *State* v. *Donaldson*, 32 N. J. L. 151; *Crump* v. *Commonwealth*, 84 Va. 927, 10 Am. St. Rep. 395, 6 S. E. 620; *United States* v. *Kane*, 23 Fed. 748; *Callan* v. *Wilson*, 127 U. S. 540, 555, 8 Sup. Ct. 1301. POWERS, J., in *State* v. *Stewart*, 59 Vt. 286, 59 Am. Rep. 710, 9 Alt. 559, says: "A combination of two or more persons to effect an illegal purpose, either by legal or illegal

means, whether such purpose be illegal at common law or by statute, or to effect a legal purpose by illegal means, whether such means be illegal at common law or by statute, is a common law conspiracy." And in *State* v. *Glidden*, 55 Conn. 47, 3 Am. St. Rep. 23, 8 Alt. 890, an indictment for conspiracy to violate a statute very similar to section 1893 of our Code was sustained by the court. While conspiracy in itself is not an indictable offense under our law, all these authorities show conclusively that such a combination for the purpose of doing injury to the public or to individuals is *per se* wrongful. Civil consequences are not changed by reason of the fact that the combination is not made a statutory offense.* Recent decisions sustain the doctrine that in a proper case, where two or more persons conspire and confederate together for the purpose of destroying or injuring the business of another, or doing violence to his property or property rights, and it is clearly made to appear that the injury is threatened and imminent, and will become irreparable to the suitor, an injunction will lie to restrain the conspirators: *Brace* v. *Evans*, 3 Railway and Corporation Law Journal, 561; Cogley on Strikes and Lockouts, 342; *Emack* v. *Kane*, 34 Fed. 47; *Sherry* v. *Perkins*, 147 Mass. 212, 9 Am. St. Rep. 689, 17 N. E. 307; *Cœur d'Alene Mining Company* v. *Miners' Union*, 51 Fed. 260, 19 L. R. A. 382; *Casey* v. *Cincinnati Typograph ical Union*, 45 Fed. 135, 12 L. R. A. 193; *Toledo and ...... Arbor Railway Company* v. *Pennsylvania Company*, 54 Fed. 730, 19 L. R. A. 387, and *Arthur* v. *Oakes*, 63 Fed. 327, 25

* In *Lucke* v. *Clothing Cutters' Assembly*, 39 Am. St. Rep. 421, 19 L. R. A. 408, 77 Md. 396, an assembly of the Knights of Labor was held liable in damages for procuring the discharge of a nonunion workman by threatening to interfere with his employer's business. A similar case is *Morris* v. *Bricklayers' Union*, 23 Weekly Cincinnati Law Bulletin, 48, where plaintiff recovered a substantial judgment against a union and some of its members for boycotting him. The case was appealed to the supreme court of Ohio and affirmed, though no opinion was handed down. *Jackson* v. *Stanfield*, (Ind.), 36 N. E. 345, and *Crump* v. *Commonwealth*, 10 Am. St. Rep. 395, are additional examples of the same kind.—REPORTER.

L. R. A. 414. The case of *Sherry* v. *Perkins*, was put directly upon the ground that the acts complained of constituted a nuisance. The cases of *Brace Brothers* v. *Evans*, *Emack* v. *Kane*, *Cœur d'Alene Mining Company* v. *Miners' Union*, and *Casey* v. *Cincinnati Typographical Union* may well be taken upon the same ground. The Toledo and Ann Arbor Railway Company case went upon the ground that circuit courts of the United States have jurisdiction by a bill in equity to restrain violations of the interstate commerce law to the irreparable injury of the complainant; and, *Arthur* v. *Oakes*, that any illegal combination or conspiracy upon the part of employés, which has for its object the crippling of the property in the hands of a receiver, and the embarassment of the operation of railroads under his management, would be enjoined.

The cases principally relied upon by plaintiff to sustain the injunction in the case at bar are *Brace Brothers* v. *Evans* and *Casey* v. *Cincinnati Typographical Union*. In each of these cases the acts complained of were most aggravated and virulent. In the former case the plaintiffs were proprietors and managers of a steam laundry, with a large and lucrative business. Circulars were issued alleging abusive treatment of the employés by plaintiffs, and asking all persons to cease patronizing them. This was followed by several other circulars, similar in character, some of which had printed thereon in large letters, "Boycott Brace Brothers." A sign was placed on a building in large letters: "Headquarters Brace Brothers Boycott Committee." Men followed plaintiffs' wagons in buggies having banners attached to the harness on each side of the horse containing "Boycott Brace Brothers" in large letters. Persons visited plaintiffs' agents, and requested them to cease acting as such, and, upon their refusal to do so, circulars were distributed denouncing them, and asking the public to boycott them. Men were

posted in front of their places of business, who distributed circulars in large numbers, thereby collecting large and noisy crowds, which seriously interfered with the conduct of their business, and required the protection of the police. As a result, the agents of plaintiffs resigned, and many of their customers withdrew their patronage.    In the latter case the facts shown by the bill of complaint and affidavits in support of the injunction were scarcely less reprehensible.    Casey, the plaintiff, was the proprietor of The Covington Daily Commonwealth.    The boycott was directed against his paper.    Notices and letters were sent everywhere to his subscribers and advertisers, requesting and demanding that they should withdraw their patronage from The Commonwealth.    The following are only specimen extracts therefrom: "Take Notice.—It is requested of all who are friendly to organized labor that they buy nothing from the following firm: The Commonwealth, (newspaper and job office,) Covington, Kentucky."   "The union now appeals to all in sympathy with labor to use their influence with Mr. Casey; try to show him the error of his way, and, failing in that, to withdraw their patronage from the 'rat' or 'scab' Commonwealth until it is unionized."   "The union will consider it a great favor for you to give up the agency of The Commonwealth.    If you do not do so we will have to consider you the enemy of organized labor."   "If you wish to retain the good will of labor, withdraw your advertising from The Commonwealth, refuse to subscribe for the sheet, and your aid in our behalf will be highly appreciated."    An article in the Union Bulletin, the organ of the defendant union, entitled, "Boycott The Commonwealth," which was full of such expressions as "The boycott is still on, and will be until the proprietor of that 'rat' sheet employs union men." "Withdraw your patronage from the 'scab' Commonwealth."   "Do not patronize a merchant who advertises

in the 'rat' Commonwealth." "If you see the paper in any place of business, refuse to buy goods unless the merchant immediately stops the 'rat' sheet." "We call upon every friend of organized labor to get his printing done in the union printing offices. Beware of that 'rat' trap at Fifth and Scott Streets, Covington, Kentucky." The inevitable result of such an attack was to utterly destroy Casey's Commonwealth, and leave him without occupation or property of any value.

7. Has plaintiff herein brought itself within the purview of the doctrine of these cases, or, in other words, does it show such threatened and imminent injuries to its business and property as will result in its irreparable detriment and loss? The allegations of the existence of a conspiracy between the officers and members of Multnomah Typographical Union, No. 58, to compel the plaintiff to submit to the dictation of the union upon pain of being boycotted in its business must be taken as true for the purposes of the demurrer. The first overt act, as before stated, was the entry of the executive committee upon the premises of plaintiff without leave or license, and ordering the union men to cease work under penalty of being dealt with according to the laws and regulations of the union. If this was a wilful aggression upon plaintiff's rights, it would constitute trespass, for which an action would lie sounding in damages. It must also be taken as true that through the wilful and malicious acts of the conspirators plaintiff lost the city printing for eighteen hundred and ninety-three, the Meier & Frank Company business, and will lose that of Mason, Ehrman & Company, all valuable business. These acts were committed within a space of about ten months, and constitute a grievance not to be lightly considered, but we cannot agree with counsel that plaintiff is remediless in a court of law. The direct cause of the loss of the city printing is definitely alleged, and

the cause of the loss and apprehended loss of the business of the two firms named is, perhaps, sufficiently, though argumentatively, stated.   In aggravation of the incident of the executive committee ordering the men to cease work it is alleged "that said committee and members of said union, further combining and conspiring to injure and force the plaintiff into their unlawful demands, circulated the facts that the said employes of the plaintiff had been called off, and ordered by them to stop work, and the plaintiff's office left without hands." But it is not shown how these facts were circulated. For all that appears it might have been by the ordinary discussion of the passing incidents of the time.   Nor is it shown to whom they were communicated, whether to the patrons of plaintiff, or to other members of the union, or to any person or persons in particular.   As to the second time the union employes quit, the complaint is more explicit.   The fact was circulated by posting the following notice in numerous places: "Owing to the Longshore Printing Company breaking the rules of the Multnomah Typographical Union, all members of the union were withdrawn March sixteenth, eighteen hundred and ninety-three." This may or may not have been detrimental to plaintiff's business, and would depend somewhat upon the state of siege existing at the time.   Referring to the notice published in the Oregonian of August twenty-seventh and twenty-eighth, eighteen hundred and ninety-two, it would appear that this was ominous of mischief, but the incident occurred some nine months prior to the commencement of this suit, and was not repeated. Neither of these notices, however, approach the vicious character of those complained of in *Brace Brothers* v. *Evans* and *Casey* v. *Cincinnati Typographical Union.* While it might be inferred therefrom that a boycott was on, and that they were intended to affect injuriously the business of plaintiff, yet they were not so direct and positive, nor

so persistently and wickedly repeated and maintained, when taken in connection with the accompanying incidents, that a court of equity could say that the injury ensuing will become irreparable unless enjoined.

8.   The allegations of the complaint that "the said president and executive committee have notified plaintiff that it had resumed its work of destruction with renewed vigor and malice against it, and this time will make war on it to the knife," and "said president and committee notified plaintiff that it now intended to resume its attacks upon it, and fight it to the death," and such amplified averments as, "so the plaintiff says, that in pursuance of said unlawful combination and conspiracy, from time to time it has been unlawfully and maliciously interfered with by the said officers and members of said union in its business, and has been subjected to continual secret assaults in influence brought to bear by them in order to injure and destroy its business, and that its patrons have been continually harassed, and both impliedly and expressly threatened by them with boycott if they continued to give business to the plaintiff, and that other trade union associations have been enlisted and persuaded by said union to take part in the crusade against it.   *   *   *   The very nature of the attacks made on plaintiff render it impossible to trace them fully, or to control them.   That they are insidious, made in secret, or at all events without the knowledge or presence of the plaintiff when made, and few of the instances come to its knowledge except through their injurious effects, as to which plaintiff in many cases is left to infer the cause.   *   *   *   Enough instances have come to its knowledge in which the said officers and members of said union have been pursuing their malicious, unlawful, and fraudulent course to demonstrate that it has been kept up persistently, and has been widespread in the

community for nearly all the time since the first mentioned demand about ten months ago,"—cannot avail the pleader unless they are accompanied with statements of definite facts and circumstances, so that the court can arrive at the same conclusions. Except as to the few instances herein discussed it does not appear which of plaintiff's patrons have been continually or at all harassed, how they or any of them were threatened with boycott, what if any other trades union associations have been enlisted to take part in the crusade, what instances of secret attack have come to the knowledge of plaintiff, or what injurious effects they can trace directly to the defendants. The facts stated should be the approximate cause of plaintiff's injuries, or of the apprehension of those threatened and imminent. As was said by MITCHELL, J., in *Bohn Manufacturing Company* v. *Hollis*, 54 Minn. 233, 40 Am. St. Rep. 319, 21 L. R. A. 337, 55 N. W. 1119, such averments and assertions "look very formidable, but in law as well as mathematics it simplifies things very much to reduce them to their lowest terms."

9. The authorities all agree that a court of equity will not hesitate to avail itself of the extraordinary process of injunction, when the circumstances of the particular case require it, in order to protect rights of property against irreparable damage done by wrongdoers. Such process, however, should be issued with great caution and circumspection. BALDWIN, J., in *Bonaparte* v. *Camden, etc., Railroad Company*, 1 Baldwin, 205, Fed. Cas. 1617, says: "There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or is more dangerous in a doubtful case, than the issuing of an injunction. It is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be

clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction; but that will not be awarded in doubtful cases, or new ones not coming within well established principles, for if it issues erroneously an irreparable injury is inflicted, for which there can be no redress, it being the act of the court, not of the party who prays for it. It will be refused till the court is satisfied that the case before them is of a right about to be destroyed, irreparably injured, or that great and lasting injury is about to be done by an illegal act. In such a case the court owes it to its own suitors and its own principles to administer the only remedy which the law allows to prevent the commission of such act." The showing of plaintiff is clearly insufficient to bring itself within the rule thus explicitly stated by the learned judge. The plaintiff may have its action at law against defendants for some of the acts complained of, and defendants or some of them may have by their conduct subjected themselves to a criminal prosecution under .the statute, and the plaintiff may have been much annoyed, and at times viciously harassed, by defendants; yet one thing is clear, there is no such persistent, aggressive, and virulent boyc٠٠ ٠٠ now in progress, nor was there at the time of the commencement of this suit, as to justify the court in saying that plaintiff's business and property is being, or is about to be, destroyed or irreparably injured. We do not say that an injunction is an improper or unavailable remedy to stay the destructive and pernicious ravages of a boycott, but that in this particular case plaintiff has not brought itself within the rules of that particular jurisdiction of equity. The court below was right in sustaining the demurrer, and its decree in dismissing the complaint is affirmed.

AFFIRMED.