CASEY *v.* CINCINNATI TYPOGRAPHICAL UNION No. 3 *et al.*

(*Circuit Court, S. D. Ohio, W. D.* January 31, 1891.)

**1. INJUNCTION—BOYCOTTING NEWSPAPER.**
A combination or a conspiracy, by a trades union, to boycott a newspaper for refusing to unionize its office, is illegal and unlawful, and will be enjoined by a court of equity.

**2. SAME.**
Equity will enjoin the publication and circulation of posters, hand-bills, circulars, etc., printed and circulated in pursuance of such combination or conspiracy to boycott.

**3. SAME.**
Such a suit is not a suit to enjoin the publication of a libel.

**4. SAME—EVIDENCE.**
Statements of defendants, repeated by an advertiser to a solicitor seeking a renewal of advertisements, at the time he refuses to renew the same, as the reasons for such refusal, may be given in evidence as part of the *res gestœ*, by such solicitor upon the hearing of a motion for an injunction.

**5. SAME.**
Upon the hearing of a motion for a temporary injunction, hearsay evidence may be competent, inasmuch as probability of right is often sufficient to call for the exercise of an injunction *pendente lite.*

In Equity.

The complainant, proprietor and publisher of the Commonwealth, a daily and weekly newspaper published at Covington, Ky., sues to restrain the defendant, the Cincinnati Typographical Union No. 3, which, the bill avers, is a corporation organized under the laws of Ohio as a trades union or labor organization, composed of type-setters and printers, and the individual defendants, who, it is averred, are its officers and managing agents, from "boycotting" the complainant and his newspaper.

A restraining order to remain in force until the hearing and disposition of complainant's motion for a temporary injunction having been granted when the bill was filed, the cause is now before the court upon that motion.

It appears from the bill that in September, 1890, and at various other times, the defendant, the typographical union, demanded that complainant should unionize his office, that is to say, publish and conduct his paper according to the customs, rules, and regulations laid down and

prescribed by said typographical union, and that he should pay his employes wages at such rates as should be fixed from time to time by said union, and discharge from his employment all persons not members thereof.

The bill further avers that upon complainant's refusal to comply with said demands, defendants illegally and unlawfully and with intent to injure complainant, and to destroy the circulation of his newspaper, and its value as an advertising medium, conspired and combined to boycott him and his newspaper, and to that end caused to be printed and posted, in conspicuous places, large hand-bills, calling upon all persons to withdraw their patronage from complainant's newspaper, and issued circulars, signed by said typographical union and addressed to advertising patrons of the complainant, requesting them to withdraw their advertisements from his said newspaper, threatening that upon failure to do so they would be visited with the ill will and incur the enmity of all organized labor, and that they would induce all members of labor associations to withdraw all patronage from them. It is also averred that said typographical union sent circulars to the news agents handling and selling complainant's newspaper, threatening that unless they ceased selling said paper they would in like manner lose the patronage of and be antagonized by the members of all labor organizations.

The bill further sets forth that said typographical union, through its agents and employes, visited persons regularly advertising in complainant's newspaper, and threatened them that unless they withdraw their advertisements they would incur the enmity, ill will, and antagonism of all organized labor and of the friends of such labor, who would withdraw from them their entire business patronage.

The answers of the defendants have not yet been filed. The hearing of the motion was upon the bill, and upon affidavits filed on behalf of the complainant, and on behalf of the defendants. There is not much dispute as to the facts. Excepting the averment that the typographical union, through its agents, visited the advertising patrons of the Commonwealth, or any other patrons of the complainant, and threatened to boycott them unless they withdrew their patronage, the averments of the bill are substantially admitted.

The complainant, in his affidavit, states that compliance with the demand made upon him in September by the individual defendants who acted in that behalf as a committee from the typographical union, that he should unionize his office, would have necessitated the discharge of all the printers employed by him and the substitution and the exclusive employment of what are known as "Union Printers," that is, members of some typographical union, and that there was not then, nor is there now, any complaint upon the part of his employes. He says that he refused to comply with the demands so made, and continued to run his office as before, paying his printers the price agreed upon, which was satisfactory to them.

The complainant further sets forth in his affidavit particulars of the boycott thereupon inaugurated against him, and his paper and job office,

as set forth in the bill.    Copies of the hand-bills and circulars referred to are filed with the affidavits, and the names of customers to whom they were sent are given.

The following is a copy of the hand-bill referred to in complainant's affidavit:

"*To Workingmen and All Persons Interested in Organized Labor:*    The Covington Daily Commonwealth, after two years' promising repeatedly to unionize their office, stated to a committee from the typographical union that they would not employ union printers on their paper.    Therefore the typographical union asks all workingmen and women who sympathize with laborers to let the Commonwealth severely alone, and patronize those who employ union men, and who believe 'the laborer is worthy of his hire.' "

The following is a copy of a circular:

"*To Workingmen:* The proprietor of the Covington Commonwealth (daily and weekly) after two years of opposition to organized labor, he having repeatedly promised to unionize his office, now refuses to keep his word, and says that he will not employ union printers.    All working men and women who believe that the laborer is worthy of his hire will confer a favor on typographical union by withdrawing their patronage from the Covington Commonwealth."

In the Union Bulletin of October 1, 1890, issued under the auspices of Cincinnati Typographical Union No. 3, and published at Cincinnati, is to be found the following:

"TAKE NOTICE.

"It is requested of all who are friendly to organized labor that they buy nothing from the following firms:    *    *    *    The Commonwealth, (newspaper and job office,) Covington, Kentucky."

A like notice is published in the Union Bulletin of October 29, 1890.

The complainant attaches to his affidavit a copy of a communication which, he stated, was sent by the union to Messrs. Griffin, agents for sale of complainant's paper, and which reads as follows:

"OFFICE OF TYPOGRAPHICAL UNION NO. 3.

"November 3, 1890.

"*Messrs. Griffin*—DEAR SIRS: About two years ago the union compositors employed on the Covington Daily Commonwealth quit working because Col. Casey, the proprietor, would not live up to the scale of prices of this union. Mr. Casey afterwards promised to employ union men and the union, relying on the promise, looked for the fulfillment of the same.

"On Monday, September 22, 1890, a committee from Typographical Union No. 3, waited upon Mr. Casey, and asked him to keep the promise he had so often made.    Col. Casey informed the committee that he would not employ union printers.

"The committee then reported his answer to the union.    The union now appeals to all in sympathy with labor to use their influence with Mr. Casey: try to show him the error of his way, and, failing in that, to withdraw their patronage from the 'rat' or 'scab' Commonwealth until it is unionized.

"Very respectfully,

"TYPOGRAPHICAL UNION NO. 3.

"This union will consider it a great favor for you to give up the agency of the Commonwealth.    If you do not do so, we will have to consider you an enemy to organized labor."

This was mailed at Cincinnati to Griffins' Novelty Bazar, 101 York street, Newport, Ky.

Complainant also attaches a copy of the Union Bulletin of December 1, 1890, which contains the following article:

### "BOYCOTT THE COMMONWEALTH."

"We understand that Mr. Casey is going around and telling his advertisers and subscribers that his office is now a union office; that the difficulty with the Typographical Union No. 3 has been adjusted.

"Such is not the case, however. The boycott is still on, and will be until the proprietor of that 'rat' sheet employs union men.

"We request all K. of L. assemblies, unions, and working men to bear in mind that Mr. Casey refuses to employ, or in any way recognize, organized labor. We ask your aid in compelling Mr. Casey to recognize the rights of labor. Withdraw your patronage from the 'scab' Commonwealth, and, if possible, let Mr. Casey know why you stop his 'rat' paper.

"Do not patronize a merchant who advertises in the 'rat' Commonwealth.

"If you see the paper in any place of business, refuse to buy goods unless the merchant immediately stops the 'rat' sheet.

"Typographical Union No. 3, both in letter and spirit, has performed its part of the contract with Mr. Casey, and equal good faith is expected from the proprietor of the Commonwealth; but he persistently refuses to live up to promises made.

"Members of labor organizations in Covington, Newport, Dayton, Bellevue, and Ludlow are requested to take a personal interest in our fight against the 'rat' Commonwealth.

"When you observe the Commonwealth imprint on any work in your locality, or run across any work that you think has been done in Covington, please inquire into the matter, and serve the interests of all concerned.

"The merchant who will patronize the 'rat' Commonwealth, after the decided stand the proprietor (Mr. Casey) has taken against organized labor, does not deserve your patronage.

"We call upon every friend of organized labor to get his printing done in the union printing-offices. Beware of that 'rat' trap at Fifth and Scott streets, Covington, Ky.

"Mr. Casey states that he publishes the only daily paper in Covington, and should not be discriminated against by the citizens.

"Did Mr. Casey think of discrimination when he shut out his union printers, (three of them residents of Covington,) in 1888, and compelled them to seek employment elsewhere?"

The complainant filed the affidavit of J. Plaut, a member of a firm of jewelers at Cincinnati, Ohio. He states that the firm received by mail on or about December 1, 1890, the following circular:

"DEAR SIR: We beg leave to call your attention to the trouble between the Covington Daily Commonwealth and Typographical Union No. 3. In the spring of 1888 the proprietor of the Commonwealth refused to pay the scale of wages agreed upon, and the union men quit working. Mr. Casey afterwards promised to pay the scale, but kept putting it off, and now refuses to keep his promise.

"The Typographical Union No. 3 has lived up to its part of the contract, but Mr. Casey refuses to recognize labor in any way. Therefore we request your aid in unionizing the Commonwealth.

"You are a business man, and no doubt rely upon the workingmen for some trade. If you wish to retain the good-will of labor, withdraw your ad-

vertising from the Commonwealth, refuse to subscribe for the sheet, and your aid in our behalf will be highly appreciated.

"Very respectfully,

"TYPOGRAPHICAL UNION NO. 3."

The complainant also presents to the court the affidavits of sundry of his advertising patrons, prominent business men of the city of Cincinnati, and of the cities of Covington and Newport, Ky., showing the receipt by them of the circulars above. These affidavits make it clear that by concerted action complainant's advertising patrons, who furnished him the bulk of his business in that line, were plied, through the mails, up to the issuance of the restraining order herein, with circulars calling upon them to withdraw their advertisements under penalty of the loss of the trade and the good-will of members of labor unions, and of all in sympathy with them.

There is also the affidavit of Henry M. Davis, advertising solicitor in Cincinnati for complainant. He states that Mabley & Carew and Fechheimer Bros. & Co., business firms in Cincinnati, were up to the 1st of October, 1890, regular advertisers in the Commonwealth, and that their advertisements were of the value of about $150 per month to complainant. Early in October, 1890, he visited said firms, and, as usual, solicited their advertisements, which were refused, for the reason, as stated by their advertising managers, that they had been visited by a committee of said typographical union, and threatened that unless they withdrew their advertisements no member of any trades union or labor association would purchase from them, and that he had since then repeatedly visited and solicited them, and in each case met with the same refusal, stated to be for the same reason, and that the advertising patronage of said firms had been wholly withdrawn from said paper because of said threats.

The affiant mentions several other firms of Cincinnati, advertising in the Commonwealth, who reported to him that they were in like manner threatened.

On behalf of the defendants there was presented the joint affidavit of the defendants J. B. Stoop, Oscar Bailey, and Frank L. Rist, who say that they are members of said typographical union, and connected with its management, and well acquainted with all the facts and acts of said union, so far as they relate to matters alleged by the complainant.

They further say that in the fall of 1888, and at divers times between that date and September 29, 1890, committees of the union, whereof one or more of the affiants in each instance were members, called upon complainant and urged and requested him to employ members of the union in the publication of his newspaper and the carrying on of his business of job printing, and to pay the prices, which were fair and reasonable, fixed by the scale adopted by said union, and that the complainant from time to time promised said committees, and in divers ways induced them to believe, that he would comply with their request.

They admit that they visited the complainant in September, 1890, as he alleges in his affidavit, and they say that they then reminded him of his promises as above stated, and requested him to comply with them,

which he refused to do, and informed them that he would not employ union printers, that is to say, members of said typographical union, in his office at all.

They further deny that any of the circulars or other publications mentioned by complainant in his affidavit misrepresent the facts as they existed.

They further say that none of the firms mentioned in complainant's affidavit were at any time visited by a committee from said typographical union; that no such committee was ever appointed by said union; and that the members of said union individually, so far as is known to affiants, and known to the defendants named in the bill of complaint, have not at any time visited said firms or any other persons in regard to the differences between the complainant and the said union, or its members. Nor has said union, or its members, in any manner, through its committees or agents, threatened said firms or any other persons as complainant has alleged in his affidavit; nor has said union, or any committee therefrom, or any of its members, so far as is known to affiants, in any wise interfered with the printers employed by the complainant, or with any of his employes.

They deny that any committee, officer, or agent of the union has at any time visited the firm of Mabley & Carew, or the firm of Fechheimer Bros. & Co., in respect to said differences, or threatened said firms, or either of them, in any manner, through committees or agents, as is charged upon hearsay in the affidavit of Henry M. Davis.

They further deny that the posters, circulars, and other publications mentioned in complainant's affidavit contained or were intended to express any threats or to seek by intimidation to interfere with the business of the complainant. They affirm that said posters and circulars and other publications were intended to present, and did in fact present, reasons why they should give their patronage to, and employ the members of said typographical union; and to those employers who were friendly to and willing to employ members of said union and like unions of organized labor.

Defendants also file the affidavit of Henry Curtin, the advertising manager of Mabley & Carew, and of Ed Renau, advertising manager of Fechheimer Bros., who say that they have read the affidavit of Henry M. Davis, and that it is not true that they or their firm were threatened by said union, or any committee thereof, with the loss of patronage if they continued to advertise in the Covington Commonwealth, and they deny that they so stated to Davis.

Appended to the affidavit of Renau is the affidavit of Jacob S. Fechheimer, of the firm of Fechheimer Bros. & Co., and with Renau in charge of the advertising matters of said firm. He states that he has read Renau's affidavit, and that it is true in its statements of facts.

*Simrall & Mack* and *Mr. Bryan*, for complainant.

*Kittredge & Wilby*, for defendant.

SAGE, J., (*after stating the facts as above.*) After the presentation of the facts up n the hearing of the motion, the court called upon counsel for

the defendants to state the grounds of their objections to the granting of an injunction. They first challenged the jurisdiction in equity, citing *Kidd* v. *Horry*, 28 Fed. Rep. 773; *Society* v. *Roosevelt*, 7 Daly, 188, 190; *Assurance Co.* v. *Knott*, L. R. 10 Ch. 142; *Richter* v. *Tailors' Union*, 24 Wkly. Law Bul. (Sept., 1890,) 189; *Mayer* v. *Association*, (N. J., Nov., 1890,) 20 Atl. Rep. 492; *Mogul Steam-Ship Co.* v. *McGregor* 15 Q. B. Div. 476; and *Moores* v. *Brick-Layers Union*, 23 Wkly. Law Bul. 48.

*Kidd* v. *Horry* was an application to restrain the defendant by injunction from publishing certain circulars alleged to be libelous and injurious to complainants' patent-rights and business, and from making and uttering libelous and slanderous statements concerning the validity of complainants' letters patent or their title thereto, or concerning their business, during the pendency of a suit to restrain the infringement of said patents. Justice BRADLEY, who decided the case, in the course of his opinion said that the application rested principally upon a line of recent English authorities, which depended on certain acts of parliament, and not on the general principles of equity jurisprudence, but that neither the statute law of this country, nor the well-considered judgment of a court, had introduced this new branch of equity into our jurisprudence. "There may be a case or two looking that way, but none that we deem of sufficient authority to justify us in assuming the jurisdiction. * * * We do not think that the existence of malice in publishing a libel, or uttering slanderous words, can make any difference in the jurisdiction of the court. Malice is charged in almost every case of libel, and no cases of authority can be found, we think, independent of statutes, in which the power to issue an injunction to restrain a libel or slanderous words has ever been maintained, whether malice was charged or not."

This case was approved and followed in *Wheel Co.* v. *Bemis*, 29 Fed. Rep. 95, by Judges COLT and CARPENTER, in the United States circuit court of Massachusetts. To the same effect, see *Boston Diatite Co.* v. *Florence Manuf'g Co.*, 114 Mass. 69. Mr. Justice GRAY was then the chief justice of the supreme court of Massachusetts, and pronounced the opinion, holding that "the jurisdiction of a court of chancery does not extend to cases of libel or of slander or of false representations as to the character or quality of the plaintiff's property, or as to his title thereto, which involve no breach of trust or of contract." Upon the authority of this case, and of *Assurance Co.* v. *Knott*, the supreme court of Massachusetts held in *Whitehead* v. *Kitson*, 119 Mass. 484, that there was no jurisdiction in equity to restrain a person falsely representing that the plaintiff's patent infringed a patent owned by himself, and thereby deterring others from purchasing the plaintiff's invention.

The case in 7 Daly was upon a motion to vacate a preliminary injunction, which had been granted, restraining the defendants, as members or visitors of the state board of charities, from publishing the proceedings before them in their inspection and examination, under the statute, of the affairs and conduct of the complainant and its officers, which pro-

ceedings, it was averred, were secret and *ex parte,* the society having been excluded from being present by counsel, and not allowed to cross-examine witnesses or produce testimony on its own behalf, or to know even, except from the publications of the proceedings, what charges were made against it or its officers. The court held that, conceding the facts as stated, and that the matter published was defamatory and libelous, the defendants could not be restrained by a court of equity, and that those injured must seek their remedy by a civil action, or by an indictment in the criminal courts; the exercise of any equitable jurisdiction to restrain publications being repugnant to the constitutional provision that every citizen may fairly speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right, and that no law should be passed to restrain the liberty of speech and of the press.

In *Assurance Co.* v. *Knott* the court was asked to restrain the publication of a pamphlet which, it was charged, contained false statements of the rates of premium charged by complainant, and represented the company as being managed with reckless extravagance, and as being in a state of insolvency, and unable to fulfill its engagements; and it was averred that the continued publication would be very injurious to the company's credit, and could not fail greatly to damage its business and diminish its profits. HALL, V. C., refused to grant an injunction, and the plaintiff, by way of appeal, applied to Lord CAIRNS, L. C., who held that there was no ground whatever for the interference of the court; that if the publications did not amount to libels, and were therefore innocuous and justifiable in the eye of the court of common law, he was at a loss to understand upon what principle the court of chancery could interfere; and if, on the other hand, the comments were libelous, it was clearly settled that the court of chancery had no jurisdiction to restrain their publication.

In *Richter* v. *Tailors' Union,* a similar rule was applied. In that case the petition set forth that the defendants unlawfully combined and conspired to break up and destroy plaintiff's business, and that in order to accomplish that purpose they maliciously compelled plaintiff's employes to quit working for them, and prevented others from working for them. The means by which this was accomplished were not specified. "Whether it was done by moral suasion, by argument, by reason, or by intimidation and violence, is not shown by either the petition or the evidence." All that did appear was that the defendants printed and published circulars, and that the plaintiff had lost customers because the latter had heard that plaintiff was employing scab or inferior tailors. It was not shown from what source the alienated customers derived their information, but it was assumed by counsel for the plaintiff that it was from the circulars. The court held that the only question before it was whether it could enjoin the publication of a libel, and that the only remedy against such publication was at law. To the same effect is *Mayer* v. *Association.* Indeed, the law as stated in all these cases is so thoroughly established as to be beyond controversy, and it is not neces-

sary to refer more particularly to other cases cited in support of it. *Francis* v. *Flinn*, 118 U. S. 385, 6 Sup. Ct. Rep. 1148, is quite as strong an authority as any cited.

The question with which we have to deal is whether this case falls within the rule. That the defendant, the typographical union, set on foot a boycott against the complainant, as stated in the bill, and in the affidavits on file, is not denied. That this boycott was to be enforced by threatening loss of business to those who, having no connection with the union, should continue to advertise with, or in any way patronize, the complainant, is clearly shown. True, it is claimed that no threats were used; but the language of the circulars has no doubtful meaning. The affidavits on file show that it was perfectly understood by those who received them; and the circumstances indicate that it was intended that it should be so understood. In *Brace* v. *Evans*, 3 Ry. & Corp. L. J. 561, it was held that the word "boycott" is in itself a threat. "In popular acceptation it is an organized effort to exclude a person from business relations with others, by persuasion, intimidation, and other acts which tend to violence, and thereby coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs." But it is insisted for the defendants that every representation of fact contained in their hand-bills and circulars is true; that is to say, that the complainant had, in 1888, broken with the typographical union, discharged all union employes, and had since that date employed only those who were not members of the union; and that after repeatedly promising to unionize his office he had finally, in September, 1890, refused to do so, and declared that he would not employ any person who was connected with the union. All these are conceded facts. Therefore, argue counsel for the defendants, this is only a case of lawful competition. The complainant having declared that he would not employ any member of the union, the union had a right to say that its members would not patronize the complainant. Nobody disputes that proposition. If that were all that is involved in this case, there would be nothing for the court to act upon. But it is not all by any means. Instead of "fair, although sharp and bitter, competition," as is contended by counsel, it was an attempt, by coercion, to destroy all competition affecting the union. It was an organized conspiracy to force the complainant to yield his right to select his own workmen, and submit himself to the control of the union, and allow it to regulate prices for him, and to determine whom he should employ and whom discharge. In other words, it was and is an organized effort to force printers to come into the union, or be driven from their calling for want of employment, and to make the destruction of the complainant's business the penalty for his refusing to surrender to the union. Whatever moral obligation may have been incurred by complainant by reason of his promises to unionize his office, they were wholly without consideration, and they amount to nothing whatever in law or in equity.

No case has been cited where, upon a proper showing of facts, an unsuccessful appeal has been made to a court of chancery to restrain a

boycott. The authorities are all the other way. At common law an agreement to control the will of employers by improper molestation was an illegal conspiracy. In New York it has been held that the "boycott" is a conspiracy in restraint of trade. *People* v. *Wilzig*, 4 N. Y. Crim. R. 403; *People* v. *Kostka*, Id. 429. So, also, in Virginia: *Com.* v. *Shelton*, 11 Va. Law J. 324. And in Connecticut: *State* v. *Glidden*, 3 Atl. Rep. 890. And in England: *Reg.* v. *Barrett*, 18 L. R. Ir. 430.

In *Emack* v. *Kane*, 34 Fed. Rep. 47, the United States circuit court for the northern district of Illinois held that equity had jurisdiction to restrain an attempted intimidation by one issuing circulars threatening to bring suits for infringement against persons dealing in a competitor's patented article, the bill charging, and the proof showing, that the charges of infringement were not made in good faith, but with malicious intent to injure complainant's business. Judge BLODGETT recognized, in his decision, the authority of *Kidd* v. *Horry* and *Wheel Co.* v. *Bemis*, cited for the defendants in this case, but said that the case before him was fairly different and distinguishable from those cases in a material and vital feature. In those cases the interference of the court was sought to restrain the publication of libelous attacks upon the property of the complainant. In *Emack* v. *Kane* the gist of the complaint was that the publications were only means employed to carry into effect a malicious intent to injure and destroy the complainant's business. Judge BLODGETT said:

"I cannot believe that a man is remediless against persistent and continued attacks upon his business, such as have been perpetrated by these defendants against the complainant, as shown by the proofs in this case. It shocks my sense of justice to say that a court of equity cannot restrain systematic and methodical outrages like this by one man upon another's property rights. If a court of equity cannot restrain an attack like this upon a man's business, then the party is certainly remediless, because an action at law, in most cases, would do no good, and ruin would be accomplished before an adjudication would be reached. True, it may be said that the injured party has a remedy at law; but that might imply a multiplicity of suits, which equity often interposes to relieve from. But the still more cogent reason seems to be that a court of equity can, by its writ of injunction, restrain a wrong-doer, and thus prevent injuries which could not be fully redressed by a verdict and judgment for damages at law. Redress for a mere personal slander or libel may perhaps properly be left to the courts of law, because no falsehood, however gross and malicious, can wholly destroy a man's reputation with those who know him; but statements and charges intended to frighten away a man's customers, and intimidate them from dealing with him, may wholly break up and ruin him financially with no adequate remedy if a court of equity cannot afford protection by its restraining writ."

This is a clear and forcible statement of the law, and is in accord with the general current of authority.

How strongly it applies in this case may be readily seen by referring to the editorials in the Bulletin, the organ of the union, and to the handbills and circulars set forth in the statement of facts. The editorial in the Bulletin of December 1st declares that the boycott "is still on, and will be until the proprietor of the 'rat' sheet employs union men." It

requests "all K. of L., assemblies, unions, and workingmen to bear in mind that Mr. Casey refused to employ or in any way recognize organized labor." It asks their aid in compelling complainant to recognize the rights of labor by withdrawing their patronage from his paper, and if possible let him know why. It calls upon them not to patronize any merchants who advertise in complainant's newspaper, and if they see the paper in any place of business to refuse to buy goods unless the merchant immediately stops the "rat" sheet. The communication sent by the union on the 3d of November to Messrs. Griffin, agents for the sale of complainant's paper, contains the following:

"This union will consider it a great favor for you to give up the agency of the Commonwealth. If you do not do so, we will have to consider you the enemy of organized labor."

These are fair samples, and they indicate the method by which the boycott was to be made effective. Yet counsel say that there were no threats; that the defendants were only exercising their constitutional right to freely speak and publish their opinions; that what defendants have done is a necessary and natural and proper incident of bitter, but yet lawful, competition, and that this was only fair argument and persuasion. These propositions are in direct conflict with decisions made long ago, and recognized in all subsequent cases. In *Rex* v. *Eccles*, 1 Leach, 274, the defendants were indicted for conspiring to impoverish a tailor, and by direct means to prevent him from carrying on his trade. They were convicted, and upon a motion in arrest of judgment it was objected that the indictment ought to have stated the acts that were committed to impoverish the tailor and to prevent him from carrying on his trade in order that the defendants might thereby have notice of the particular charges they were called upon to answer. But Lord MANSFIELD, without hearing the prosecution, said that that was certainly not necessary. "The offense does not consist in doing the acts by which the mischief is effected,—for they may be perfectly indifferent,—but the conspiring with a view to effect the intended mischief by any means. The illegal combination is the gist of the offense." See, also, *In re Wabash R. Co.*, 24 Fed. Rep. 217. In that case the following notice was sent to various foremen of the shops of the railroad company, during a strike organized to resist a reduction of wages, the railroad company being at that time in the hands of a receiver appointed by the United States circuit court:

"'OFFICE OF LOCAL COMMITTEE.

"'June 17, 1885.

"'———, *Foreman:* You are requested to stay away from the shop until the present difficulty is settled. Your compliance with this will command the protection of the Wabash employes. But in no case are you to consider this an intimidation.'

"Held, that this was an unlawful interference with the management of the road by the receiver, and a contempt of court, for which the writer should be punished."

The court, in passing upon the case, said:

v.45F.no.3—10

"The statement in all these notices that they are not to be taken as intimidations goes to show beyond a doubt that the writer knew he was violating the law, and by this subterfuge sought to escape its penalty."

In *U. S.* v. *Kane*, 23 Fed. Rep. 748, Judge BREWER, after stating that "every man has a right to work for whom he pleases, and go where he pleases, provided in so doing he does not trespass on the rights of others," by way of illustrating what is a threat, supposes that one of two workmen is discharged. The other is satisfied with his employment and wishes to stay. The discharged workman comes with a large party of his friends, armed with revolvers and muskets, and says: "Now my friends are here;—you better leave;—I request you to leave." In terms there is no threat, but it is a request backed by a demonstration of force, intended and calculated to intimidate, and the man leaves really because he is intimidated. Again, armed robbers stop a coach. One of their number politely requests the passengers to step out and hand over their valuables, and they do so. To the charge of robbery the defense is made that there was no violence; there were no threats; there was only a polite request, which was complied with. The court said that any judge who would recognize such a defense deserved to be despised, and the court was right.

In *State* v. *Glidden*, cited hereinbefore, Judge CARPENTER, speaking for the supreme court of Connecticut, states that the defendants said in effect to the publishing company:

"You shall discharge men you have in your employ, and you shall hereafter employ only such men as we shall name. It is true, we have no interest in your business; we have no capital invested therein; we are in no wise responsible for its losses or failure; we are not directly benefited by its success; and we do not participate in its profits,—yet we have a right to control its management, and compel you to submit to our dictation."

The court said that the bare assertion of such a right was startling; that, if it existed, all business enterprises were alike subject to the dictation and control of those who asserted it, and upon the same principle and for the same reason the right to determine what business men shall engage in, and when and where and how it shall be carried on, will be demanded, and must be conceded to associations of workingmen of the class of those whom it would be necessary to employ. The opinion in this case, although the case itself arose upon an indictment for conspiracy, is a well-considered discussion of the law with relation to boycotting. See, also, *Steam-Ship Co.* v. *McKenna*, 30 Fed. Rep. 48.

In the light of these authorities it is idle to talk about the defendants' acts and publications as mere incidents of a competition set on foot by complainant's declaration that he would not employ union printers; that the publications are shielded by constitutional guaranties; or that, viewed in the most unfavorable light, they are nothing more than libels, and the only remedy for any injury resulting is by an action at law.

It is claimed that the recital in the affidavit of Davis of what was said to him by the managers of the advertising department of Mabley & Carew and of Fechheimer Bros. & Co., when they withdrew their patronage

from the Commonwealth, to-wit, that it was because they had been visited by a committee of the typographical union, and were threatened with the loss of business, ought not to be considered, because it is hearsay.

There are two answers to this claim:

*First.* What was said is clearly admissible as part of the *res gestæ*, to show the state of mind of the persons in doing the act which their declarations accompanied.

*Second.* Upon the hearing of a motion for a preliminary injunction, the rules of evidence are applied less strictly than upon the final hearing of the cause, and consequently evidence that would not be competent in support of an application for a perpetual injunction should be admitted. *Buck* v. *Hermance*, 1 Blatchf. 322; *Matthews* v. *Manufacturing Co.*, 19 Fed. Rep. 321. The reason for the rule is plain. Probability of right is sufficient to authorize a preliminary injunction. In many cases it is granted to preserve property *in statu quo* during the pendency of a suit in which the rights to it are to be decided, and that without expressing, and oftentimes without having the means of forming any opinion as to such rights. *Great Western Ry. Co.* v. *Birmingham & O. J. Ry. Co.*, 2 Phil. Ch. 597.

The rule, with the reason for it, applies with peculiar force when it is sought to exclude the statements referred to from consideration. The advertising managers made haste to deny that any threats were uttered to them by anybody representing the typographical union. They did not, however, set forth what was said, nor did they deny that they withdrew their advertisements from the Commonwealth, nor intimate any reason for so doing other than that stated by Davis. It is not now the proper occasion to consider fully what prompted their denials. That should be reserved until the final hearing, after full opportunity to cross-examine Davis upon the one hand, and the advertising managers who made the denials upon the other hand, and to present to the court a full showing of all that was said when they were called upon by the committee of the union. According to the logic of counsel for defendants almost anything might have been said without precluding the denials.

I have made the statement of the facts as they are set forth in the bill and affidavits quite full, and have entered somewhat at length upon the discussion of the questions involved, because of the request by counsel on both sides for a full statement of the case, with the reasons of the court for its conclusions, inasmuch as the decision upon the motion may practically settle the entire controversy between the parties.

The motion for a temporary injunction, to continue in force until the final decree in this cause, will be granted.