OXLEY STAVE CO. v. COOPERS' INTERNATIONAL UNION OF NORTH AMERICA et al.

(Circuit Court, D. Kansas. March 9, 1896.)

No. 7,284.

1. JURISDICTION OF FEDERAL COURTS—ENJOINING BOYCOTT.

In a suit by a Missouri corporation to enjoin certain trades unions or assemblies, and their members, from instituting a boycott, the federal court has no jurisdiction of individual defendants who are citizens of Missouri, nor can the association be sued as a body, or members thereof enjoined who are not parties to the record.

2. CONSPIRACY—UNLAWFULNESS OF BOYCOTT.

A "boycott" by the members of trades unions or assemblies (which term, in law, implies a combination to inaugurate and maintain a general proscription of articles manufactured by the party against whom it is directed) is unlawful, and may be enjoined by a court of equity.

This was a bill in equity by the Oxley Stave Company against the Coopers' International Union of North America, Lodge No. 18, of Kansas City, Kan., the Trades Assembly of Kansas City, Kan., and various individuals named, who are officers and members of such organizations, and also "all other persons who may be members of either of said organizations, their agents, attorneys, etc., to enjoin them from inaugurating and maintaining a boycott against the use of packages, casks, barrels, etc., made by complainant by means of certain machines constituting part of its plant.

Overmeyer & Mulvane, for complainant.

Getty & Hutchings, and Rossington, Smith & Dallas, for defendants.

FOSTER, District Judge. The complainant is a corporation organized under the laws of Missouri, and engaged in the cooperage business at Kansas City, Kan., making barrels, tierces, casks, etc., for packing meat, lard, flour, and other products. The defendants are alleged to be citizens of Kansas. The Coopers' International Union of North America, No. 18, and the Trades Assembly of Kansas City, are voluntary associations, not incorporated. The other defendants are officers and members of said associations. The complainant asks for an injunction against said defendants, restraining and enjoining them from issuing a boycott against the products of its manufactory. It charges "that the defendant associations are composed of a large number of persons, having their lodges and organizations in all of the trade centers of the United States and other countries, and that said associations and the other defendants, the officers of said societies, have combined, confederated, and conspired together to do said complainant a great and irreparable injury, in this, to wit: That complainant has placed in its factory, and is using in its business, machines designed for and used in fitting up and hooping barrels, tierces, casks, etc.; that none of the employés of said complainant are in said conspiracy, or make any objections to complainant's use of said machines, or have any grievances against said complainant whatever; that said defendants have so combined, confederated, and conspired together to demand, and have demanded, of this complainant, that it shall discontinue the use of such machines in its plant, and in the manufacture of barrels, on and after the 18th day of January, 1896; and that, upon the refusal of said complainant to so discontinue the use of said machines as aforesaid, they, the said defendants, will cause a boycott to be placed on all packages, casks, barrels, tierces, etc., hooped by said machines, and against the trade and business of complainant." The bill further alleges, at great length, what action has been taken by defendants in pursuance of said combination and conspiracy to make the boycott effective; "that said associations passed resolutions, and appointed committees to wait upon this complainant, and demanded that it discontinue the use of said machines, under the penalty of a boycott in case of refusal, and other committees were ap-

pointed, and have waited upon the large packing houses who were the chief customers of said complainant, to the extent of many thousands of dollars each year, to wit, the Armour Packing Company, the Jacob Dold Packing Company, Swift & Co., Fowler Sons & Co., Limited, and others, and demanded of said packing companies that they refuse to buy or use said machine-made packages of said complainant, and in·case they should refuse said demand, and use said packages, that said defendant associations would cause a boycott to be placed on all products of said packing companies packed in said machine-hooped barrels and packages; that by reason of said demand and threats said packing companies and others have been deterred from making contracts with complainant for its said barrels, tierces, casks, etc., and have been induced to cease the use of the same, through fear of injury to their said business by reason of said threatened boycott; that by reason of said defendant having its associate organizations in all the trade centers, and the great number of members thereof throughout the country, wherever labor organizations and trade unions exist, they have the power to coerce and intimidate persons who would purchase complainant's goods, and thereby work a great and irreparable injury to complainant, of not less than one hundred thousand dollars, for which complainant has no legal redress, as defendants are not pecuniarily responsible," etc. On the presentation of the bill a temporary restraining order was allowed until the matter of an application for temporary injunction could be heard.

The defendants James A. Cable and William Deal have filed pleas to the jurisdiction of the court, on the ground that they and other members of said associations are not citizens of Kansas, but are citizens of Missouri. From the evidence in the case, these pleas are well taken. It is also objected that the defendant associations cannot be sued as a body, or its members enjoined who are not parties to the record. These objections are also well taken, and the complainant has leave to dismiss as to said parties, and the case stands only against the other defendants named in the bill.

This brings us to the question whether, under the allegations of the bill, which is verified, and the other evidence presented, the complainant is entitled to the relief prayed for. The material allegations of the bill are but partially controverted by the defendants. Indeed, they are substantially admitted. Much testimony was offered to show that barrels hooped by machinery were not as serviceable or as valuable as hand-hooped barrels. It also appears that there is some little difference in the price of such barrels; that a skilled workman can hoop 14 to 16 barrels per day by hand, and that the hooping machine does the work of about six or seven men; and that boys or young men, from 16 years upwards, are employed, to some extent, in operating the machines. All of this cuts but little figure in the case. Whether the work of the machine is better or worse than the hand work is not material. The barrels are made and sold as machine work, and a price fixed accordingly, and the customer must decide whether or not he will buy them; and the complainant, in operating the machines in its business, is

engaged in a legitimate enterprise, and defendants had no legal right to demand that it should cease operating them. There is some testimony tending to show that the reason the packing companies had not made contracts for these barrels for this year was not on account of the threatened boycott, but because they preferred hand-hooped barrels. The purchasing agent of Fowler Sons & Co., Limited (Robert McWhittaker), however, testified that a committee of the Coopers' Union and Trades Assembly notified him, if his company purchased machine-made barrels, they would boycott the contents of the barrels, and that such notice would tend to make his company very careful about purchasing machine-made barrels. The manager of Swift & Co. testified that his company was buying hand-made barrels on account of the threatened boycott. The following is a copy of the resolution of the Trades Assembly on the subject, and indicates the purpose of the defendant associations:

"To the officers and members of the Trades Assembly, Greeting: Whereas, the cooperage firms of J. R. Kelley and the Oxley Cooperage Company have placed in their plants hooping machines operated by child labor; and whereas, said hooping machines is the direct cause of at least one hundred coopers being out of employment, of which a great many are unable to do anything else, on account of age,—at a meeting held by Coopers' Union No. 18 on the 31st of December, 1895, a committee was appointed to notify the above firms that unless they discontinued the use of said machines on and after the 15th of January, 1896, that Coopers' Union No. 18 would cause a boycott to be placed on all packages hooped by said machines, the 15th January, 1896; and at a meeting held by Coopers' Union No. 18 on the 4th of January, 1896, delegates were authorized to bring the matter before the Trades Assembly in proper form, and petition the assembly to indorse our action, and to place the matter in the hands of their grievance committee, to act in conjunction with a committee appointed by Coopers' Union No. 18 to notify the packers before letting their contracts for their cooperage. Therefore, be it resolved, that this Trades Assembly indorse the action of Coopers' Union No. 18, and the matter be left in the hands of the grievance committee for immediate action.

    "Yours, respectfully,                    J. L. Collins,
       "Sect'y Coopers' International Union of N. A., Lodge 18."

James Cable, president of Coopers' Union, testified as follows: Unless complainant ceased using the machines—

"That the boycott would be declared by the Coopers' Union upon the contents of the tierces and barrels hooped by machinery; meaning thereby that the members of the said Coopers' Union, and of its parent association, the Trades Assembly, would thereafter cease to purchase or use any of the commodities that were packed in machine-hooped tierces or barrels."

No one can question the right of the defendants to refuse to purchase machine-made packages, or of goods packed in them, or, by fair means, to persuade others from purchasing or using them. If that is all that is implied by a boycott, as insisted by defendants, it is difficult to see where they violate any law, although it might injure the complainant's business. It has been decided, however, that while such action would not be unlawful by an individual, a combination and conspiracy to accomplish the purpose would be an illegal act. In Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 321, 322, Mr. Justice Harlan says:

"It is one thing for a single individual, or for several individuals, each acting upon his own responsibility, and not in co-operation with others, to form the purpose of inflicting actual injury upon the property or rights of others. It is quite a different thing, in the eye of the law, for many persons to combine or conspire together with the intent not simply of asserting their right of accomplishing lawful ends by peaceable methods, but of employing their united energies to injure others or the public. An intent upon the part of a single person to injure the rights of others or of the public is not in itself a wrong of which the law will take cognizance, unless some injurious act be done in execution of the unlawful intent. But a combination of two or more persons with such intent, and under circumstances that give them, when so combined, a power to do an injury they would not possess as individuals acting singly, has always been recognized as in itself wrongful and illegal;" citing Callan v. Wilson, 127 U. S. 540, 8 Sup. Ct. 1301; also. Com. v. Hunt, 4 Metc. (Mass.) 111.

The term "boycott" has acquired a significance in our vocabulary, and in the literature of the law. The resolution of the defendant associations says, unless complainant discontinue the use of said machines on and after January 15, 1896, that Coopers' Union No. 18 would cause a boycott to be placed on all packages hooped by said machines. Just what action would be taken, the resolution does not state. It does not say the defendants would not purchase the packages, or the goods packed in them, but simply says a "boycott" would issue. That term implies that a general proscription of all articles so manufactured, and the goods packed in them, would be inaugurated and maintained by the power of these assemblies, wherever they could reach. It is fair to presume, from the resolution and other testimony, that the defendants were determined to use all means, short of violence, to make the proscription effective. That has been the history of such proceedings in the past, and such is the meaning imputed to the use of the word "boycott." It has become a word carrying with it a threat and a menace, and was evidently so intended by this resolution. In Thomas v. Railway Co., 62 Fed. 818–821, the court says:

"But the combination was unlawful, without respect to the contract feature. It was a boycott."

Again the court says:

"The combination under discussion was a boycott. It was so termed by Debs, Phelan, and all engaged in it. Boycotts, although unaccompanied by violence, have been pronounced unlawful in every state of the United States where the question has arisen, unless it be in Minnesota, and they are held to be unlawful in England."

The court further says:

"Boycotts have been declared illegal conspiracies in State v. Glidden, 55 Conn. 46, 8 Atl. 890; in State v. Stewart, 59 Vt. 273, 9 Atl. 559; Steamship Co. v. McKenna, 30 Fed. 48; Casey v. Typographical Union, 45 Fed. 135; Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 730, and in other cases."

The case above cited (Casey v. Typographical Union, 45 Fed. 135) is very much in point in this controversy.

From these authorities we reach the conclusion that complainant is entitled to the relief prayed for. The labor-saving machines which modern invention has brought into every industry in life excite our wonder and admiration, but our enthusiasm is subdued

by the thought that the machines must largely drive the skilled laborer out of a field he has spent years to fit himself for, and upon which, more or less, depends the means of livelihood for himself and his family; and yet it is a hopeless task for the laborer to contend against the use of machinery, wherever it can be utilized. Labor can only adjust itself to the constant progress made in all the mechanical pursuits, and it has been well said that, despite all the inventions to save hand work, there never was a time when the laborer was paid better, or had greater advantages, than he has to-day. The injunction will be allowed as prayed for by complainant.