# CHARLESTON.

PARKER PAINT AND WALL PAPER COMPANY *v.* LOCAL UNION
No. 813 *et als.*

Submitted February 1, 1921.    Decided February 8, 1921.

1. CONSPIRACY—*Association May Not Accomplish Unlawful Purpose by Lawful Means.*

    An association of persons will not be permitted to accomplish a lawful purpose by the use of unlawful acts; and conversely, will not be permitted to accomplish an unlawful purpose even by means that would otherwise be unlawful. p. 639).

2. INJUNCTION—*Act of Inducing Breach of Contracts May be Enjoined.*

    Where a person or combination of persons seeks to destroy another's trade or business and by their actions influence or

intimidate others with whom he has valuable contracts, causing said others to break such contracts and discharge his employees then actually performing the same, and the loss is actual, continuing and irreparable, injunction will lie to compel such person or combination of persons to desist from such acts p. 639).

3.   SAME—*Persons May be Enjoined from Carrying Banners Causing Owner to Cancel Contract with Plaintiff for Painting.*

Where a contractor has entered into a contract to paint a store building with the owner who then conducts a retail merchandise business therein, and is actually in the performance of his contract, it is unlawful for others to carry banners in front of the store with the words thereon; "This store is unfriendly to union labor," or "This store is unfair to union painters," or like legends, the said persons carrying said banners, or causing the same to be carried, having no industrial dispute with the store owner, thereby causing the said store owner, in fear of loss or violence, to cancel said contract and discharge the contractor, to his irreparable loss; and such "bannering" will be enjoined.   (p. 639).

4.   SAME—*Writ Lies to Prevent Conspiracy to Induce Others to Break Valid Contract.*

Persons who conspire to induce others to break a valid contract between other persons are liable to action therefor, and if the loss occasioned thereby is continuing and irreparable, injunction will lie to prevent it.   (p. 639).

Appeal from Circuit Court, Cabell County.

Suit by the Parker Paint & Wall Paper Company against Local Union No. 813 and others for an injunction.   An injunction granted by the Judges of the Supreme Court upon the circuit court's refusal to do so was by the circuit court dissolved, and plaintiff appeals.

*Reversed, injunction reinstated, remanded.*

*Warth, McCullough & Payton,* for appellant.

LIVELY, JUDGE:

An injunction was sought by the Parker Paint & Wall Paper Co. against Local Union No. 813 and others to prevent defendants from interfering with the orderly conduct of plaintiff's business, to prevent picketing of complainant's place of business and its employees, or terrorizing them, or persons with

whom plaintiff has contracts, or in any way attempting to. cause or influence other persons with whom plaintiff has valuable contracts to cancel the same.

Plaintiff is engaged in painting, decorating and papering in the city of Huntington and employs from five to ten men and sometimes more, in carrying out its contracts and the conduct of its business. It became a member of an organization known as the Master Painters Association of the City of Huntington, which had been incorporated for the purpose of organizing the employers of painters, decorators and paper hangers for mutual aid in the conduct of their affairs, and to obtain uniformity in bidding on contracts, possibly to prevent competitive bidding among its members. The members were operating under a wage contract with Local Union No. 813, effective until April 1, 1920, and conducting the "closed shop." The defendant, Local Union No. 813, was a union labor organization, a branch of the Brotherhood of Painters, Decorators and Paper Hangers of America, with headquarters in the city of Indianapolis, Ind. In the month of January, 1920, friction arose between the local union and those of its members who composed the master painters organization, and these members were not allowed to sit in the meeting of the local union or to participate in its affairs, although holding "union cards," under a rule or by-law, which annulled the membership of any employer who joined any organization of employers. After some futile attempts to adjust the differences between the two organizations, the local union refused to allow its members to work on any contracts being carried on by the master painters, or labor on any work in which any member of the master painters organization worked. They would not labor on the same work on which the employer also labored, unless he withdrew from the master painters and took out a "union card" in Local Union 813. On February 7, 1920 the local union called its men off of a house where they were employed by one, G. W. Day, a member of the master painters, because he, Day, had painted a mantel in the house. The master painters then began to employ non-union men on their contracts, and the trouble began in earnest with increasing intensity. Plaintiff company,

managed by P. C. Parker, who had been an active participant in the troubles, presented its bill for injunction to the Judge of the Circuit Court of Cabell County on March 19, 1920, alleging, among other things, that it had valuable contracts for painting, decorating and papering houses in said city, and especially with L. H. Cammack, for painting, papering and decorating a new house on Third Avenue, and with McCrorey's 5 & 10 Cent Store for interior work, and with Huntington Homes Building Company for various buildings; that defendants had combined and conspired together to destroy its business, and had caused to be carried, to and fro in front of the 5 & 10 cent store, banners, which bore the legands, "This store is unfriendly to union labor" and "This store is unfair to union painters," and that thereby the manager of the store became intimidated, and, fearing loss in trade, compelled complainant to cease work; that then the agents of the defendants approached said store manager, declaring to him that plaintiff would not be permitted to finish the work, and asked him to give them the job of finishing the same. He refused, and plaintiff's men were again placed on the work, and the intimidation and "bannering" again began, when the store manager again refused to allow plaintiff to proceed unless defendants could be made to cease the "bannering." It is also alleged that in further pursuance of the conspiracy, the defendants went to the Cammack house, where plaintiff's employees were laboring, and induced them and others not in plaintiff's employ to cease work, or interfered with them in such a way as to cause the work to be hindered or delayed to such an extent that Cammack cancelled his contract with plaintiff, and, in order to get his house finished, contracted with the members of the local union for that purpose, causing great loss to the plaintiff; that plaintiff had its principal place of business and paint shop in the Deardorff-Sisler Department Store in said city, and defendants were carrying banners in the street before the store building with the legend thereon: "The wall paper department of this store is unfriendly to union labor," and "The wall paper store in this building is unfair to union labor," causing confusion and near breaches of the peace, and causing embarrassment of and finan-

cial loss to the department store. The bill also charged defendants with placing "pickets" at the entrance to plaintiff's place of business for the purpose of intimidating its employees, and persuading them to leave plaintiff's employ; and that a confederate of defendants, not giving his name, had attempted to bribe the janitor, a colored man, in the 5 & 10 cent store to pull down the scaffolding in the store from under plaintiff's employees while at work. There are other allegations in the bill which are unnecessary to detail.

Upon refusal of the circuit court to grant an injunction, the bill was presented to the judges of this court and an injunction as prayed for was awarded on March 20, 1920, effective until the further order of the Circuit Court of Cabell county. On March 29, 1920, the defendants answered, denying any conspiracy to injure the plaintiff, denying the picketing, or the carrying of banners with legends thereon in front of either of the stores mentioned; in short, denying all the material allegations of the bill. The bill and answer were supported by nineteen affidavits. The circuit court dissolved the injunction on April 2, 1920, from which action this appeal was awarded.

Inspection of the pleadings and analysis of the affidavits brings the conclusion that this litigation is the result of a controversy between Local Union 813 and master painters, primarily over the right of a member of the master painter's organization to continue as a member of the local union, and to personally labor on his own contracts while a member of the master painters. The master painters asserted their right so to labor, and not having union cards in the local union, recognized as genuine by the members of the local union, the union laborers refused to work on contracts with members of the master painters. This occurred on the 7th of February, when the union men withdrew from the Geo. W. Day job because Day had painted a mantel without having a recognized union card. This brought about the employment of non-union men by the members of the master painters in order to complete their contracts and carry on their business. These non-union men were brought from various points without and within the State. The local union then began the acts complained of against the

plaintiff, a member of the master painters. There was no controversy over a wage scale or questions of that character. The local union succeeded so far as the record goes in preventing any of its members from working for the plaintiff. While the answer denies the material allegations of the bill, and the affidavits affirm that nothing was done by defendants to prevent the plaintiff from peaceably and orderly carrying out its contracts, we are faced with the fact that by reason of the activities of the defendants, through their business agents and walking delegates, they caused plaintiff to lose its partly performed contract with L. H. Cammack. The bannering in front of the 5 & 10 cent store caused a loss of that contract to plaintiff, or at least delay until this suit was begun; the bannering of the Deardorf-Sisler Department Store was calculated to bring about strained relations between that store and plaintiff and did cause annoyance to the landlord of plaintiff and possible financial loss. It tended to destroy plaintiff's business. It is true that this bannering of these stores was disavowed by the business manager of defendant local union, but it is shown, and not controverted, that members of the local union carried these banners to and fro, and when any number of persons form an organization and act together in a common undertaking, each member is the agent of all, and the act or declaration of one in pursuing the common undertaking is the act of all and is admissible as evidence against them. 1 Greenleaf Ev. (16th. Ed.) sec. 184b. We do not attach much weight to the affidavit of the janitor in the 5 & 10 cent store to the effect that he was offered a bribe, by someone unknown to him, to pull the scaffolding from under the non-union workmen of plaintiff while working in the store. We rather think it was ascribable to the peccant humor of some individual enthusiast and are loath to believe it was planned or countenanced by defendants. The affidavit of L. H. Cammack is illuminating on what occurred at his new house, and although partially controverted, it is not denied that the result was as charged. Cammack's affidavit is as follows: "Early in February—on the 4th day of February—I made a contract with the Parker Paint & Wall Paper Company to finish my house at 1606 Fifth Avenue, paint it

outside and in, for which I was to pay them $720.00. Mr.
Parker was in, and in a couple of days he put three men on
the job. At the same time I made arrangements with Hagan
& Company to put on a tin tile roof, and Hagan's men were
working on the roof at the time that Parker's men came to
work. They had only worked a part of a day when I began to
see various people that I didn't know coming into my house
without asking permission, and walking around and looking at
the workmen, and then going out and holding conferences on
the sidewalk and back of the house. At one time there were
two or three sets of them on the premises. None of them
spoke to me; they brushed past me and went on in the house
and all over the house, and would then come back and hold a
conference and go off. The next day the tinners were on the
house at work, when a man by the name of Galt, whom I know
by sight and whom I was told was some sort of a walking
delegate, came up to the house and kept motioning to the
tinners to come down and see him, and finally one of them went
down. Galt was there several times during the day in company
with other men, whom I was told were painters; and along
during the afternoon just before a big storm came up, the
tinners came off of the house and said nothing to me. However,
a big storm came and did great damage to my plastering and
woodwork, because they left the roof entirely unprotected and
went on down to Hagan & Company's place of business. I
went onto Hagan & Company and found from Mr. Hagan that
the tinners had been ordered off by this fellow Galt, or some-
body who seemed to be attending to their affairs, because they
said they would not work with any of Parker's men. A fellow
by the name of Bond here in town, whom I never employed
to attend to my business, and had only heard of,—J. H. Bond,
I believe it is—came up that evening and said that he wanted
to arbitrate the affair. I told him that I had not employed
him in any connection on the house, and there was nothing
for us to arbitrate; that it was my business and not his,
and the only thing I would ask him to do would be to
attend to his business and let me attend to mine. The
next few days following this, I was visited by several painters,

who said that they were union painters, and among them I remember a fellow by the name of Corley, who urged that I let him do the work because he was a union painter, and that I could go ahead and not have any trouble if I would let him do the work. He made three or four trips to the office to see me. I paid no attention to that, and was expecting to have Mr. Parker go ahead with the contract. Other painters, some of whom I knew and some of whom I did not know, came on the same mission, saying that they were union painters, and that if I employed them they would straighten it out and put the tinners back to work and save my house from being ruined by rain, etc. Much to my disgust, and although it was very repugnant to me to do so, I employed a man who said that he was a union painter, to go ahead with the work, because of the fact that I could not get a roof on the house and protect it from the weather otherwise. In the meantime I had asked Mr. Parker to take his men from the house, which he very courteously did, saying that he did not want to embarrass me in the matter at all; and in order to get the roof on and at the same time get into a house which I had been held out of for months on account of a seemingly unending series of delays while the work was being done by some of those employed, I put a man on who said that he was a union painter, to finish some of the painting, and then the tinners went back on the job. The whole business was scattered over a very long time. Mr. Parker came in on Friday very early in February, and the next Monday he had some men there, and that day or the next day the tinners were on the roof, and they worked that day, but the next day they came off; that was the first day that all these walking delegates were around there attending to my business for me.

"Mr. Davis, the man I employed to look after the carpenter work, said that he had been called down to union headquarters and ordered to quit the job and also take his carpenters off, and Mr. Davis informed me that he had told them he would not quit the job under any circumstances, no matter what they did or what threats they made. So Mr. Davis and his carpenters stayed on the job.

"I employed Jesse Saddler to put in the tile mantel about a week after giving the contract to Parker for the painting, and his men started to work, but Mr. Saddler came to me and told me that they were making so much fuss that he doubted whether he could get his men to work on the job as long as any of Parker's men were working. It was for these reasons, and because I wanted to get in the house, that I asked Mr. Parker to take his men away and let me get ahead with the work, and protect the house, particularly, by getting a roof on it."

There are two legal propositions which are applicable to this case. (1) A lawful purpose cannot be carried out by the use of unlawful means. (2) If the purpose be unlawful, it may not be accomplished even by means that would otherwise be legal.

What was the purpose of these various acts of the defendants? They affirm that their purpose was a lawful one, and was for the maintenance of their organization; that their acts were peaceful and persuasive. But it is manifest that the means by which this end was sought to be attained was the destruction of plaintiff's business by bringing combined pressure upon the persons with whom plaintiff had contracted for the sale of its labor, and causing them to abrogate those contracts. There can be no question of the right of the defendants to form a union for their mutual protection and advantage, and enlarge their union by inducing others to join for this legitimate and proper object; but there can be no question, on the other hand, that this right must be so used as not wantonly to conflict with the rights of others. The same is true of the master painters' organization. A person can use the highway in his automobile, but he must not forget that others have the same right, and he must not damage them wantonly or unwittingly. If one person wantonly or maliciously, whether for his own benefit or not, induces a person to violate his contract with a third person to the injury of that third person, an action will lie. *Thacker Coal Co.* v. *Burke,* 59 W. Va. 253. The bannering of the 5 & 10 cent store, charging it with being unfair to union labor, and unfair to union painters, could be for the purpose only of causing that store to break its contract with plaintiff. It had

that result. Defendants knew that such a contract existed, and was in actual performance. "Intentionally to do that which is calculated in the ordinary course of events to damage, and which does, in fact, damage another in that other person's property or trade, is actionable if done without just cause or excuse." *Mogul Steamship Case,* 23 Q. B. Div. 613. Does it make any difference whether it is accomplished by peaceful bannering? The result is the same as if the manager of the store had been put in fear by rioting or violence. A combination to procure a breach of contract is an unlawful conspiracy at common law. *Folsom* v. *Lewis,* 208 Mass. 336; *Thacker Coal Co.* v. *Burke,* 59 W. Va. 253. Where contracts existed between a plaintiff, who was a painter, and various other persons, owners of houses, for the painting of their buildings, and the labor organization caused a strike because the plaintiff would not recognize its walking delegate, and thereby caused the owners of the buildings to break their contracts with the plaintiff, the court said that the defendants might as well resort to physical force to enforce alleged rights or redress real or imaginary wrongs; that they were actuated by improper motives and by a malicious desire to injure the plaintiff, which the law would not tolerate, and that an injunction would be awarded. *Beatty* v. *Callanan,* 81 N. Y. Sup. 413.

The method adopted by a combination of working men for the accomplishment of a lawful purpose must itself be lawful, and they will not be permitted to cause a breach of a lawful contract, for instance by strike by plasterers against their employer, a sub-contractor, for the plastering of a building to coerce the owner into cancelling a contract for the use of a patent process of applying plaster to the outside of the building, unless the men so working on the outside are unionized or have union cards. *New England Cement Gun Co.* v. *McGivern,* 218 Mass. 198. Martin on Modern Law of Labor Unions asserts that the great weight of authority is, to the effect that organized labor's right of coercion and compulsion by strikes or withholding labor or threats thereof is limited to strikes or withholding of labor or threats thereof against persons with whom the union has trade disputes. And the use of such means

against one's customers in order to coerce them to compel him to comply with demands made on him by the union, is an unjustifiable interference with the rights of such customers. Martin's Mod. Law on Labor Unions, sec. 77; *Casey* v. *Cincinnati Typo. Union,* 45 Fed. 135; *Mathews* v. *Shankland,* 56 N. Y. Sup. 123; *Gray* v. *Building Trades Council,* 91 Minn. 171.

It is not clear just what reasons dictated the acts complained of in the bill. If for the purpose of compelling plaintiff to withdraw from membership in the master painters, it is unlawful. Plaintiff is as free to join an organization for the lawful furtherance and protection of its affairs, as are the members of the Local Union 813 to become members of that organization, designed for their protection. If for the purpose of preventing a member of the master painters from laboring with his hands in performing his own contracts, it is unlawful. A man's labor is his most sacred asset. It is often his only capital, and as long as he exerts it without injury to others, government will protect him. A government which imposes taxes and other public duties, even going so far as to demand life for its defense, and which will not protect its subjects in the "enjoyment of life and liberty with the means of acquiring property and of pursuing and obtaining happiness and safety," is not worthy of the name of government, nor of the support of its subjects. "A person's occupation or calling, by which he obtains a livelihood is property entitled to protection as such from boycotts or unlawful interferences by others." *Baldwin* v. *Escanaba Liquor Dealers,* 130 N. W. 214. If the acts were for the purpose of destroying plaintiff's contracts by making it impossible for him to employ non-union labor, and ultimately to obtain these contracts themselves and destroy competition, the purpose was unlawful. *Davis Mach. Co.* v. *Robinson,* 84 N. Y. Sup. 837. "The same liberty which enables men to form unions, and through the union to enter into agreements with employers willing to agree, entitles other men to remain independent of the union and other employers to agree with them to employ no man who owes allegiance or obligation to the union." *Hitchman Coal & Coke Co.* v. *Mitchell,* 245 U. S. 251.

It is a well settled principle, based on sound reasoning, that

no person, or persons, have the right to maliciously injure or destroy the business of another, by acts which serve no legitimate purpose of his own. "One man singly, nor any number of men jointly, having no legitimate interests to protect, may not lawfully ruin the business of another by maliciously inducing his patrons and third parties not to deal with him." *Ertz* v. *Produce Exchange*, 79 Minn. 140.

It would be cumbersome and serve no purpose here to review the various decisions and text books on boycott, primary and secondary, or on the subject of picketing. The decisions are legion, and some of the niceties and distinctions found in them are difficult to comprehend and are not very instructive. It is sufficient to say that the secondary boycott, where A is brought into a labor dispute between B and C, A having no difference with either, is generally condemned. This "secondary boycott" contemplates that A, upon the request of B, and under the moral intimidation lest B boycott him, may thus be constrained to withdraw his contracts or patronage from C, with whom he has no dispute, the controversy being only between B and C. The English courts, and the federal courts of this country, vigorously condemn it. *Loewe* v. *Lawlor*, 208 U. S. 274; *Duplex Printing Press Co.* v. *Deering*, U. S. Supreme Court, decision handed down Jan. 3, 1921. The majority of the state courts follow the federal courts. The proposition, stated tersely by Wm. H. Taft, as quoted by the California Supreme Court, is as follows: "A body of workmen are dissatisfied with the terms of their employment. They seek to compel their employer to come to their terms by striking. They may legally do so. The loss and inconvenience he suffers he cannot complain of. But when they seek to compel third persons, who have no quarrel with their employer, to withdraw from all association with him by threats that unless such third persons *do so* the workmen will inflict similar injury on such third persons, the combination is oppressive, involves duress, and if injury results, it is actionable." *Pierce* v. *Stablemen's Union*, 156 Cal. at page 76.

Even some of the state courts which hold that a reasonable boycott is lawful, condemn "picketing," holding that the end

to be attained thereby, however artful may be the means employed, is the injury of the boycotted business through physical molestation and physical fear caused to the employer, and his employed, or who may seek his employment, and to the general public. *Pierce* v. *Stablemen's Union, supra.* See also *Moore* v. *Cooks Union,* 179 Pac. 417; *Roarabock* v. *Motion Picture Machine Operators Union,* 3 A L. R. 1290.

Under the facts shown by this record and the principles of law applicable thereto, we reverse ·the order of ·the Circuit Court of Cabell County, entered April 2, 1920, dissolving the injunction, reinstate the injunction and remand the cause.

*Reversed, injunction reinstated, remanded.*